## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JAVO BEVERAGE COMPANY, INC., | Case No. _____ |
| Debtor.[1] | |

## DECLARATION OF RICHARD A. GARTRELL IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Richard A. Gartrell, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the chief financial officer of Javo Beverage Company, Inc. ("Javo" or the "Company"), debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.     On January 24, 2011 (the "Petition Date"), Javo filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.     In my capacity as the chief financial officer of Javo, I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtor. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case, and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code,

---

[1]     The last four digits of the Debtor's federal tax identification number are 4292. The Debtor's mailing address and corporate headquarters is 1311 Specialty Drive, Vista, California 92081.

and (ii) relief, in the form of motions and applications, that the Debtor has requested of the Court on the Petition Date (the "First Day Motions").

4.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Debtor's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of Debtor's operations and financial condition.   Unless otherwise indicated, the financial information contained herein is unaudited.

5.      This Declaration is intended to provide a summary overview of the Debtor and this Chapter 11 Case.  Part I of this Declaration provides an overview of the Debtor's business and corporate history.  Part II provides a description of the Debtor's organizational and capital structures.  Part III provides a discussion of the events leading to the commencement of this Chapter 11 Case. Part IV sets forth relevant facts in support of the Debtor's First Day Motions.

6.      If I were called to testify, I would testify competently to the facts set forth in this Declaration and I am authorized to submit this Declaration on behalf of the Debtor.

## PART I

### The Debtor's Business and Corporate History

7.      The Company was originally incorporated in the State of Washington as North West Converters, Inc., on February 9, 1987.  In June 1999, the Company changed its name to La Jolla Fresh Squeezed Coffee Co., Inc., and the Company then acquired the assets of Stephen's Coffee, Inc. and merged with Stephen's Coffee Holding, Inc.  In February 2000, the Company acquired all the outstanding shares of Sorisole Acquisition Corp. to become successor issuer to Sorisole pursuant to Rule 12g-3 of the Securities Exchange Act of 1934 and subject to the reporting requirements of the Securities & Exchange Commission ("SEC").  In June 2002, the

Company reincorporated from the State of Washington to the State of Delaware and simultaneously changed its name from La Jolla Fresh Squeezed Coffee Company, Inc., to Javo Beverage Company, Inc. In September 2008, Sorisole was dissolved. The Company's headquarters and manufacturing facility are located in Vista, California.[2]

8. Javo is a manufacturer of coffee and tea-based dispensed beverages, drink mixes and flavor systems primarily for the food service industry. Javo has successfully commercialized a proprietary brewing technology that yields fresh brewed coffees and teas that are flavorful, concentrated and stable under refrigeration. As a result, they have broad applications in the food service, food manufacturing and beverage industries. For food service industry customers, Javo manufactures and markets concentrated coffees, teas and specialty beverages that have the convenience and efficiency of dispenser-based systems. For food and beverage processors and retailers looking for authentic coffee and tea flavors for their packaged foods and ready-to-drink beverages, Javo supplies customized beverage formulations, extracts, and flavors.

9. The Company distributes its products through multiple, well-established food distribution methods. Javo's dispensed, on-demand coffee and tea beverages utilize broad-line food service distributors that supply a complete range of food, beverage, and consumables to food service operators. The Company continues to expand the number of national and regional distributors established to deliver its beverage concentrates to restaurants in the United States and its products are currently stocked at distribution centers operated by Sysco Foods, US Foodservice, Gordon Foods, Shamrock Foods, McLane, Core-mark, EBY Brown, Dawn Foods and other broad-line and specialty distributors. These distributors purchase Javo's

---

[2] Javo operates a 40,000 square foot facility in Vista, California pursuant to a lease.

products, manage inventories, process orders and deliver products as needed by the Company's food service customers. In the case of chain restaurant operators, designated captive distribution providers operate in a similar fashion. Javo's distributors deliver its bag-in-box products to the end user, typically a hospital, casino, hotel or convenience store. These deliveries typically accompany regular orders placed for other restaurant supplies. The end user places the product into a dispenser—usually supplied by Javo—and serves fresh hot and/or iced coffee to their customers, employees and/or patients. Javo supplies its industrial flavor systems to its food and beverage manufacturing customers by shipping bulk extracts directly to the food processing location. These flavor systems represent a relatively small percentage of the Company's overall sales. Javo has several significant direct competitors for its dispensed hot coffee business offerings in the United States, the largest being Douwe Egberts® Coffee Systems, a brand of Sara Lee Corporation. Most competitors offer either frozen products (in order to overcome extract shelf-life and stability limitations) or ambient, "shelf stable" products that rely on more aggressive processing and preservatives to maintain their shelf life. The Company's ability to offer freshly produced, refrigerated extracts gives it a competitive advantage in the market for on-demand coffee that is increasingly quality and flavor conscious.

## PART II

### The Debtor's Organizational Structure

10.    As of January 15, 2011, the authorized capital stock of the Company consists of (a) 400,000,000 shares of Common Stock ("Common Stock"), of which as of that date, 302,771,121 shares are issued and outstanding, 96,112,445 shares are reserved and available for issuance pursuant to the Company's stock option and purchase plans, and 1,116,434 shares are reserved for issuance, (b) 5,850,000 shares of undesignated preferred stock, of which as of the

date hereof, none are issued and outstanding, (c) 150,000 shares of Series A Junior Participating Preferred Stock, par value $0.001 per share, of which as of the date hereof, none are issued and outstanding, and (d) 4,000,000 shares of Series B Preferred Stock, par value $0.001 per share ("Preferred Stock"), of which as of the date hereof, 2,599,020 shares are issued and outstanding.

11.      Cede & Co holds 147,084,141 shares (48.6%) of the Common Stock. The Common Stock is listed on the Over the Counter Bulletin Board. As of the date hereof, it was trading at $0.01 per share.

12.      The Company's current board of directors is composed of 7 directors, 2 of whom were nominees of Coffee Holdings LLC ("Holdings"), a holder of 23 percent of the Common Stock and holder of unsecured notes aggregating approximately $17 million.

13.      As of December 31, 2010, the Company employed 57 full-time employees. The Company also uses outside consultants, brokers and other independent contractors from time to time. None of its employees are represented by a union.

**The Debtor's Capital Structure**

14.      Between 2002 and 2005, the Company raised $14.7 million in a series of offerings in exchange for notes bearing interest of 10 percent payable on maturity and from between 3 and 5 shares of common stock for every dollar invested depending on the offering. The notes matured 60 months after issuance in a balloon payment of principal and accrued interest at 10 percent simple interest. Due to the inability to pay the notes as they were beginning to come due in May 2006, the Company offered to exchange the notes for Preferred Stock. The Preferred Stock paid a dividend of 10 percent annually in cash or additional Preferred Stock, at the election of the Company. In addition, the Preferred Stock carried a liquidation preference of $10 per share and required mandatory redemption at such liquidation

preference in the event of a change in control. Pursuant to the exchange offer, in or about June 2006, $13,750,000 plus accrued interest or approximately 94 percent of the 60-month notes were converted to Preferred Stock. Since that time, the Company has elected to issue every annual dividend on the Preferred Stock in the form of additional shares of Preferred Stock. As noted above, 2,599,020 shares are issued and outstanding with a liquidation preference of approximately $26 million. The notes that were not exchanged were paid by the Company.

15.     In December 2006, the Company raised approximately $21 million in a convertible debt transaction in which it could repay interest and principal in the form of Common Stock subject to certain terms and conditions including a minimum required public trading price for its Common Stock.

16.     In late 2008, due to liquidity needs and in response to its inability to service the convertible debt in the form of equity issuances due to the public stock price, the Company sought to raise $30 million in debt in order to retire the convertible bonds and to provide additional capital. The Company had completed principal negotiations and due diligence with a prospective institutional investor in the fall of 2008; however, due to the international financial crisis, this transaction failed to be consummated.

17.     During its efforts to complete the $30 million transaction and in an effort to relieve liquidity constraints, in October 2008, the Company entered into a Master Purchase and Sale Agreement with Accord Financial, Inc. ("Accord") under which Accord agreed to advance up to 75 percent of the face amount of the Company's accounts receivable. As of January 19, 2011, approximately $1,324,761.84 was owed to Accord on its factoring line. In addition, Accord loaned the Company an additional approximately $595,000 as a term loan ("Term Loan"). In consideration of Accord's advances and term loan, the Company granted Accord a

security interest in its accounts receivable, equipment (except its coffee dispensers), inventory and general intangibles. As of January 19, 2011, approximately $370,500 was owed to Accord under the Term Loan.

18.     Following the failure of the $30 million debt transaction, the Company began to conduct a private placement offering dated December 2008 (the "PPO"), with individual accredited investors and pursuant to this offering, the Company ultimately borrowed $10.5 million from 46 individual investors.  In exchange for the amount invested, investors received an 8-year unsecured senior subordinated note bearing quarterly interest at 10 percent ("Investor 10% Notes") and 5 shares of unregistered common stock per dollar invested.  The Investor 10% Notes are interest only for the first 3 years.  Thereafter, principal is payable in 20 equal quarterly payments over the remaining 5 years, along with quarterly accrued interest.  The Investor 10% Notes do not have default provisions and cannot be accelerated.  As provided in the PPO and the Investor 10% Notes, the holders agreed to subordinate to "Senior Debt," defined, among other things, as an unsecured credit facility entered into following the issuance of the Investor 10% Notes that by its terms is senior in payment to the Investor 10% Notes.  The Company has failed to pay the quarterly interest that was due on the Investor 10% Notes on October 1, 2010, and January 1, 2011, aggregating $529,315.  As of the Petition Date, the outstanding amount due on the Investor 10% Notes, including principal and interest, is approximately $11,095,479.45.

19.     Closing concurrently with the completion of the $10.5 million PPO noted above, the Company completed, on April 6, 2009, the sale of an 8-year unsecured senior subordinated note bearing interest at 10 percent in the principal amount of $12 million ("Holdings 10% Notes," with the Investors 10% Notes, the "10% Notes") and 50 million shares of unregistered

common stock for a purchase price of $12.5 million to Holdings. Like the Investor 10% Notes, the Holdings 10% Notes are interest only for the first 3 years which is paid quarterly. Thereafter, principal is payable in 20 equal quarterly payments over the remaining 5 years, along with quarterly accrued interest. The Holdings 10% Notes do, however, contain representations and warranties, change in control, default provisions and other terms, including covenants limiting the amount of future indebtedness that could be incurred by the Company. The Holdings 10% Notes and Investor 10% Notes are *pari passu*. As of the Petition Date, the outstanding amount due on the Holdings 10% Notes, including principal and interest, is approximately $12,075,616.00.

20.    A substantial portion (approximately $11 million) of the net proceeds of the 10% Notes were used to redeem—at a discount—approximately $13 million of the outstanding convertible notes and associated warrants issued in December 2006 per a negotiated discounted redemption agreement.

21.    Following the completion of the 10% Note transaction, the Company continued to seek additional financing for the purchase of dispensers without success. By late summer and fall of 2009, the Company, needing additional funds to operate, began discussions and negotiations with multiple institutional investors including Holdings and ultimately completed the sale to Holdings of a 66-month unsecured senior subordinated note in the principal amount of $4 million, bearing interest at 12 percent ("Holdings PIK Notes") and 15 million shares of unregistered common stock for a purchase price of $4.1 million for the purpose of meeting the Company's working capital needs. The transaction also committed Holdings to take, at the Company's option and subject to certain conditions, additional notes and shares as payment for quarterly interest due on its Holdings 10% Notes up to an aggregate amount of $3.5 million. The

Company has elected to use the PIK from this $3.5 million commitment each quarter beginning with the interest due on April 1, 2010, which has resulted in approximately $1.2 million of additional Holdings PIK Notes and related shares being issued. The Holdings PIK Notes were structured to work within—and, as to debt for general uses, effectively used up—the allowable debt limits provided in the debt covenants in Holdings 10% Note transaction. As provided in the PPO and the Investor 10% Notes, the Holdings PIK Notes are "Senior Debt." As of the Petition Date, the outstanding amount due on the Holdings PIK Notes, including principal and interest, is approximately $5,838,457.

22.     Just prior to the filing of this Chapter 11 Case, Holdings advanced the Company $500,000[3] pursuant to a Secured Promissory Note bearing interest at 8 percent plus the greater of 3-month LIBOR or 1.50 percent. Interest is due quarterly. The monies were necessary to fund operations, including payroll. The note is secured by a senior lien on approximately 3,000 coffee dispensers located throughout the country.

23.     In addition to the foregoing, as of December 31, 2010, the Company had approximately $2.4 million in unpaid accounts payable, $1.4 million in purchase-money financing for dispensers, and $100,000 in secured equipment loans.

## PART III

### Events Leading to the Chapter 11 Case

#### Lack of Working Capital

24.     Since commencing production in late 2003, the Company has regularly suffered from a lack of sufficient working capital resources and has conducted capital raises in some form

---

[3]     Holdings advanced $100,000 on or about January 10, 2011, and the remaining $400,000 on or about January 13, 2011.

in every year since 2003 except for 2007. Despite yearly growth in revenue and strong gross profit margins, the Company's primary business of dispensed coffee products is a niche market. While the Company has helped develop this market, this process has required substantial capital investment into liquid dispensers in order to fuel growth. To date, the Company has yet to be profitable and cash inflows from operations have been insufficient to cover the Company's expenditures and substantial principal and interest payments (which have included payment of the interest on the 10% Notes), as shown by the following chart:

## Javo Beverage Company, Inc.
### Annual in 000's

| PERIOD ENDING | 30-Sep-10 | 31-Dec-09 | 31-Dec-08 | 31-Dec-07 | 31-Dec-06 | 31-Dec-05 | 31-Dec-04 |
|---|---|---|---|---|---|---|---|
| Gross Revenue | 19,642 | 23,097 | 19,561 | 12,607 | 10,322 | 6,200 | 2,084 |
| Returns & Allowances | 3,819 | 4,409 | 2,385 | 957 | (387) | (145) | - |
| Net Sales | 15,823 | 18,688 | 17,176 | 11,650 | 10,709 | 6,345 | 2,084 |
| | | | | | | | |
| Cost of Revenue | 9,178 | 10,962 | 11,224 | 8,505 | 6,811 | 4,181 | 1,396 |
| | | | | | | | |
| Gross Profit | 6,645 | 7,727 | 5,952 | 3,145 | 3,511 | 2,019 | 688 |
| | | | | | | | |
| Total Operating Expenses | 10,248 | 14,291 | 13,641 | 10,251 | 6,315 | 4,052 | 3,610 |
| | | | | | | | |
| Operating Income or Loss Before Non-Cash Expenses | (3,604) | (6,564) | (7,689) | (7,105) | (2,804) | (2,032) | (2,922) |
| Added Non-Cash | | | | | | | |
| Depreciation & Amtz | 2,738 | 3,305 | 1,895 | 507 | 310 | 266 | 236 |
| Stock Issed for Services Amtz | 538 | 120 | 378 | | | | |
| Deferred Compensation/Option Expense | 296 | 951 | 1,447 | 965 | - | - | - |
| | | | | | | | |
| Operating Income or Loss | (32) | (2,189) | (3,969) | (5,633) | (2,494) | (1,766) | (2,686) |
| Total Other Income/Expenses Net | 26 | 1,977 | 2,817 | 5,857 | 426 | 44 | 17 |
| | | | | | | | |
| Earnings Before Interest And Taxes | (3,578) | (4,588) | (4,872) | (1,248) | (2,378) | (1,988) | (2,905) |
| Interest Expense | | | | | | | |
| Interest Expense | 2,415 | 2,817 | 1,587 | 1,702 | 2,163 | 2,856 | 1,950 |
| Interest Expense - Non-Cash Discount Senior Convertible Debt | 2,013 | 6,253 | 4,311 | 4,499 | 187 | - | - |
| Accelerated Interest & Discount re Converted of Preferred Stock | - | - | - | - | 5,198 | - | - |
| Total Interest Expense | 4,428 | 9,070 | 5,898 | 6,200 | 7,548 | 2,856 | 1,950 |
| Net Income | (8,005) | (13,658) | (10,770) | (7,449) | (9,926) | (4,844) | (4,855) |

11

759752.01/SD
37114700002/jlh

**Restructuring Efforts**

25.    Beginning in 2010, the Company began to have additional liquidity constraints. Having issued and outstanding Common Stock very close to its total authorized Common Stock, at its annual meeting in June 2010, the Company's shareholders approved an increase in its authorized Common Stock to 400 million shares, which allowed the Company the necessary stock to use the $3.5 million PIK commitment from Holdings and permit it further alternatives to raise additional capital.

26.    On May 26, 2010, the then-Chairman and CEO resigned, and Stanley Greanias, a director nominated by Holdings pursuant to its rights under the PIK Note transaction, was appointed as interim CEO. Ron Beard, an existing director, was appointed as Chairman of the Board.

27.    During June and July 2010, Mr. Greanias and the executives of the Company worked on business strategies with a focus on identifying: (1) further opportunities to achieve revenue growth without the need for capital expenditures in the form of dispenser purchases, and (2) further opportunities for cost cutting within the Company.

28.    Cost saving measures included, beginning in September 2010, voluntary 15-20% salary cuts for the executives and reallocation of duties in response to the loss of certain employees rather than replacement of those employees.

29.    In light of the Company's liquidity concerns and existing debt capitalization, discussions of additional capital needs led to exploration of a possible out-of-court capital restructuring.

30.    In October 2010, the Company retained Valcor Consulting LLC ("Valcor") as its financial advisor to advise and assist it in analyzing its debt capacity relative to the Company's enterprise value and in renegotiating its debt obligations to levels appropriate to its debt capacity.

The findings of Valcor indicated that the value and debt capacity of the enterprise was substantially exceeded by its overall debt obligations and it became evident that a restructuring under the Bankruptcy Code might be the Company's only practical alternative.

31.     While continuing to search for and implement cost saving measures, the Company pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of the Company's business.

32.     In addition to seeking additional financing from Holdings, the Company's largest investor, the Company sought interim and debtor-in-possession financing from certain holders of the Investor 10% Notes and Preferred Stock, as well as from Accord, commercial lenders and other lenders.

33.     In early December 2010, the Company entered into negotiations with Holdings regarding interim financing, debtor-in-possession financing, and the terms of a plan of reorganization. After arduous negotiations, the Company and Holdings reached agreement on the terms of interim and debtor-in-possession financing which will allow the Company to continue to operate in the ordinary course while implementing a plan of reorganization that will deleverage the Company and provide the Company with sufficient working capital upon exit from bankruptcy. The Restructuring Term Sheet and related Plan Commitment Letter between the Company and Holdings are attached hereto as **Exhibit A.**

34.     Pursuant to the Restructuring Term Sheet, the Company intends to file a chapter 11 plan of reorganization (the "Plan") and related disclosure statement on or before February 7, 2011. The Plan will contain terms and conditions consistent with the Restructuring Term Sheet. The Company believes that there will be no value for its existing holders of Common Stock and Preferred Stock on account of such equity interests.

35.     On January 21, 2011, the Company and Javo Dispenser, LLC[4] ("Dispenser") reached a settlement ("Settlement"), subject to this Court's approval, with respect to claims arising under the Master Equipment Lease Agreement ("Equipment Lease") between the parties. As of December 31, 2010, the Company owed Dispenser approximately $2 million, $954,975 of past due rent payments and $1,092,240 in future rental payments. Pursuant to the Settlement, the Company's obligation under the Equipment Lease is now limited to 31 payments totaling $400,000. Upon payment of the last payment in July 2013, the Company will own the approximate 828 liquid dispensers. The Company intends to file a motion to approve the Settlement shortly after commencing its bankruptcy case.

## PART IV

### Summary of First Day Motions and Applications[5]

36.     To enable Debtor to operate effectively and to avoid the adverse effects of the chapter 11 filing, Debtor has filed, or will file upon scheduling of a further hearing by this Court, the motions (the "First Day Motions") described below.

37.     In connection with the preparation for this bankruptcy case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance or the input and assistance of employees working under my supervision and bankruptcy counsel. I believe the information contained in the First Day Motions is accurate and

---

[4] Two directors of the Company hold member interests in Dispenser aggregating less than 16%.

[5] Capitalized terms not defined in this section have the meanings given them in the applicable First Day Motion.

correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to Debtor's reorganization efforts.

38. In addition to the First Day Motions, the Debtor will, in the near term, file applications to retain Allen Matkins Leck Gamble Mallory & Natsis LLP and Morris, Nichols, Arsht & Tunnell LLP as its bankruptcy co-counsel and Valcor Consulting LLC as its financial advisor.

A.   **Motion for Entry of Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rule 4001, and Local Rule 4001-2 (I) Authorizing Debtor to (A) Sell Accounts Receivable Under a Postpetition Receivable Securitization Program With Accord Financial, Inc. and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing.**

39. By this motion, the Debtor seeks to continue postpetition its arrangement with Accord under that certain Master Purchase and Sale Agreement by and between the Company and Accord under which Accord agreed to advance up to 75 percent of the face amount of the Company's eligible accounts receivable (the "DIP Factor Facility").

40. The DIP Factor Facility provides Debtor with some, but not enough, liquidity to continue operating through the chapter 11 proceeding. Consequently, the Company sought and secured a traditional DIP Facility (as defined below) with Holdings to provide it with the necessary liquidity and working capital.

41. For the most part, the terms, including without limitation, interest, advance rates and other fees, of the DIP Factor Facility remain as they were under the prepetition facility.

42. The DIP Factor Term Sheet and DIP Factor documents were negotiated in good faith and at arm's length among the parties, culminating in a carefully crafted agreement designed to maintain the Debtor's business as a going concern during the Chapter 11 Case. Given the urgent needs of the Debtor to obtain financial and operational stability for the benefit

of all parties in interest, the terms of the proposed DIP Factor documents are the best available. The DIP Factor documents reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by fair consideration.

43.     Although additional debtor-in-possession funds are necessary, the funds provided by the DIP Factor Facility are still essential to enable the Debtor to maintain the value of its assets and business through the pendency of this Chapter 11 Case.   Without the DIP Factor Facility, the Debtor would need significantly more funds from Holdings under the DIP Facility, funds that they have not agreed to advance.   Also, there would be a significant disruption to the Debtor's business if a new factoring line was put in place or Accord's factor facility was terminated because customer payments are sent to a lock box maintained and controlled by Accord.   A significant amount of the Debtor's resources would be spent educating and redirecting customer payments.

44.     For the forgoing reasons, the DIP Factor Facility and DIP Factor documents should be approved.

**B.      Motion for Entry of Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rule 4001, and Local Rule 4001-2 (I) Authorizing Debtor to (A) Obtain Postpetition Financing From Coffee Holdings, LLC and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing.**

45.     As set forth above, the Debtor is currently facing severe liquidity restraints. Without immediate access to working capital, the Debtor will be unable to fund its day-to-day business operations during the pendency of this Chapter 11 Case, which would adversely affect the value of the Debtor's business as a going-concern.   The Debtor requires a postpetition financing commitment to preserve the value of the estate.

46.     Accordingly, the Debtor is seeking authorization to obtain postpetition financing in an aggregate amount not to exceed $3,151,000 (the "DIP Facility"). The Debtor is seeking to access up to $1,200,000 of the DIP Facility on an interim basis.

47.     In connection with the Debtor's restructuring efforts, Valcor, on behalf of the Debtor, and I contacted numerous financial institutions and other possible lenders to determine whether they were interested in providing postpetition financing to the Debtor. Due to the lack of available collateral, no one other than Holdings was willing to advance funds to the Debtor.

48.     Nevertheless, the proposal for debtor-in-possession financing advanced by Holdings is reasonable and adequately addresses Debtor's reasonably foreseeable working capital needs, while maintaining the going-concern value of Debtor's business.

49.     The DIP Lender is a holder of approximately 23% of the common stock of the Debtor and holds all of the Holdings PIK Notes and a majority of the Holdings 10% Notes. As a result of its familiarity with the Debtor, the DIP Lender is uniquely positioned to provide the Debtor with financing not otherwise available to it in the capital markets. The Debtor and the DIP Lender negotiated in good faith the proposed DIP Facility through separate and disinterested professionals, and the Debtor's board of directors approved the proposed financing without any influence from the DIP Lender. Ultimately, the Debtor decided that the proposal for debtor-in-possession financing advanced by the DIP Lender was reasonable, the best available under the circumstances, and adequately addresses the Debtor's reasonably foreseeable working capital needs. The financing affords the Debtor an opportunity to reorganize and continue its operations during the chapter 11 case. The various terms, fees and charges required by the DIP Lender under the DIP Credit Agreement are "market" and reasonable and appropriate under the circumstances.

50. The DIP Term Sheet and DIP Facility documents were negotiated in good faith and at arm's length among the parties, culminating in a carefully crafted agreement designed to maintain the Debtor's business as a going concern during the Chapter 11 Case. Given the urgent needs of the Debtor to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Facility documents are the best available. The DIP Facility documents reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by fair consideration.

51. The funds provided by the DIP Facility are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this Chapter 11 Case. If the Debtor is unable to access the DIP Facility, the going-concern value of its business will be irreparably harmed which, in turn, will adversely affect the value ultimately received by stakeholders. As discussed in the earlier in this Declaration, given the Debtor's liquidity crisis, the filing of this case and the provision of postpetition financing to facilitate a standalone financial restructuring and de-leveraging of the Debtor's capital structure (which includes provision for critical vendors, employees, and general unsecured trade claims) is absolutely vital to the Debtor's continued operations and ability to thrive as a going concern.

52. As discussed above, the Debtor has effectively solicited proposals for financing from various institutions and engaged in diligence efforts in an effort to secure debtor-in-possession financing on the best terms available. The Debtor simply was unable to procure satisfactory alternative financing on terms as good, or better, than those provided by the DIP Lender, who is familiar with the Debtor's business and the only party willing to extend junior financing. Moreover, given the Debtor's liquidity crisis, the Debtor believes that proposal offered by the DIP Lender, which is tied to a financial restructuring of the Debtor's capital

structure in which the DIP Lender holds a substantial stake, is the best available to the Debtor and will provide it with sufficient runway to effectuate a de-leveraging of its capital structure so as to exit from chapter 11 as a more viable, healthy corporate enterprise. Accordingly, the Debtor's efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

53. As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Credit Agreement and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Term Sheet. The DIP Credit Facility contain terms that are the best available under the circumstances and was negotiated and approved by non-insiders, who were not influenced by the DIP Lender (and the DIP Lender did not participate in the Debtor's decision to approve DIP Financing).

54. The funds provided by the DIP Credit Agreement are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this chapter 11 case. Indeed, failure to obtain approval of the DIP Credit Agreement will materially irreparably harm the going-concern value of its business which, in turn, will adversely affect the value ultimately received by stakeholders.

55. Accordingly, the DIP Credit Agreement is in the best interest of the Debtor's estate, creditors, and other parties in interest, and the Debtor requests approval thereof.

**C.  Motion for Entry of an Order Pursuant to Sections 105(a), 363 and 345 of the Bankruptcy Code and Local Rule 2015-2 Authorizing Debtor to (I) Maintain and Use Its Existing Bank Accounts and Business Forms and (II) Maintain and Use Its Existing Cash Management System**

56. The Debtor seeks an order authorizing it to (i) maintain and use its existing bank accounts at Wells Fargo Bank and business forms, (ii) maintain and use its existing cash management system, and (iii) to the extent necessary, be excused from complying with the

investment guidelines under Section 345 of the Bankruptcy Code. In connection with this relief, the Debtor requests a waiver of certain Guidelines established by the U.S. Trustee in this District that require the Debtor to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationary.

57.     As described in detail in the motion, the Debtor maintains a cash management and disbursement system in the ordinary course of its operations (the "Cash Management System"). The Cash Management System allows the Debtor to effectively collect cash receipts from its factor, Accord, and make disbursements to satisfy obligations to the Debtor's creditors. To lessen the disruption caused by the bankruptcy filing and maximize the value of its estate in this chapter 11 proceeding, it is vital that the Debtor maintain its Cash Management System.

58.     The Debtor maintains current and accurate accounting records of daily cash transactions and submits that the continuation of this Cash Management System will help prevent undue disruption to the Debtor's business operations while protecting Debtor's cash for the benefit of the estate. Therefore, I believe that the relief sought in the Cash Management Motion is essential and in the best interest of the Debtor's estate.

**D.      Motion for Entry of an Order Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

59.     By this Motion, the Debtor seeks authority to, among other things, satisfy certain of its prepetition obligations to its current employees (the "Employees") and independent representatives (the "Independent Representatives"), reimburse Employees  for prepetition expenses that were incurred on behalf of the Debtor and pay prepetition payroll-related taxes

associated with the Debtor's employee wage claims, other similar tax obligations, and pay any amounts due and owing under Health and Welfare Programs as defined in the Motion ("Employee Obligations"). This relief is critical to the Debtor's business and reorganization efforts.

60.     I believe that any delay in paying prepetition Employee Obligations will adversely impact the Debtor's relationship with its Employees and Independent Representatives and will irreparably impair the Employees and Independent Representatives' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in the case, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees and Independent Representatives' morale and cooperation attributable to the Debtor's failure to honor its prepetition Employee Obligations.

**E.      Debtor's Motion for Entry of an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

61.     By this motion, and to ensure the continued provision of utility services (the "Utility Services") to the Debtor, the Debtor seeks entry of an order prohibiting providers of utility services (the "Utility Companies") from altering, refusing, or discontinuing services to, or discriminating against the Debtor on account of prepetition invoices, determining that Utility Companies are adequately assured of future payment, and establishing procedures for determining adequate assurance of payment. The Debtor proposes to establish a segregated account into which Debtor will deposit the sum of approximately $20,000 (the "Utility Deposit"), which is equal to approximately two weeks of Utility Services calculated on a historical basis and, additionally, has proposed procedures to address any request made by Utility Companies for additional adequate assurance.

62.     Any disruption of Utility Services at the Debtor's headquarters, maintenance or production locations would cause irreparable harm to the Debtor's business operations and its estate.  The Debtor has established a good payment history with virtually all of its Utility Companies.  To the best of the Debtor's knowledge, the Debtor has no defaults or arrearages of any significance with respect to the Debtor's undisputed Utility Services invoices.  For the forgoing reasons, the Debtor submits, and I believe, that the relief requested in this motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**F.      Motion of Debtor for Entry of an Order Pursuant to 11 U.S.C. Sections 105(a), 363(b), 363(c), 1107(a), and 1108 and Federal Rules of Bankruptcy Procedure, Rules 6003 and 6004 (I) Authorizing Debtor to (A) Honor and Perform Certain Prepetition Obligations to Customers, (B) Continue Customer Programs and (C) Honor Certain Other Prepetition Obligations Necessary to Maintain the Existence of Customer Programs; and (II) Granting Related Relief**

63.     As I stated earlier, the Debtor is an industry leader in the manufacture, distribution and supply of quality dispensed coffee and tea beverages, drink mixes and bulk flavor systems through "bag-in-box" products.  The Debtor markets its coffee and tea concentrates to broad-line and specialty distributors, who in turn sell to wholesale food service operators such as hospitals, employee dining, casinos, and convenience stores.  The Debtor also offers coffee and tea extracts for sale to food service operators and food processers as a syrup or flavor ingredient used to make coffee and tea-flavored products in the retail food service markets.

64.     Through distributor- and customer-related programs, the Debtor offers a variety of price deviations, rebates and local and national incentive programs to its distributor customers, operators who are members of group purchasing organizations, and its local operator customers. These customer programs include, but are not limited to, rebates and incentives for meeting certain target sales, price deviation and billbacks for specific operators who are members of

group purchasing organizations or marketing and other incentives for individual customers. Depending on the particular program, the expenses for the customer programs are accrued as a percentage of the gross selling price, a fixed dollar per case sold by distributors to specific operators, actual promotion or marketing costs, and/or other payments related to sales and special advertising programs.

65.     While the distributor and customer programs vary from customer to customer, the programs generally fit into one of two broad categories: Contractual Programs and Performance Programs. By this motion, the Debtor is seeking (i) to continue the Customer Programs in the ordinary course of business and (ii) authority to pay and honor, in its sole discretion, prepetition obligations under the Customer Programs in an amount not to exceed $480,000.

66.     The Debtor believes that maintaining the Customer Programs, as appropriate, is necessary to maintain the continued loyalty of its customers. The Debtor's customers are the backbone of its business. The ability to honor and perform its obligations with respect to and continue the Customer Programs is critical to the goodwill the Debtor has worked hard to establish with its customers and distributors. Such Customer Programs have allowed the Debtor to develop and sustain a positive reputation in the marketplace for its products and services. The Debtor's business and, ultimately, the success of the Debtor's proposed restructuring depends largely on maintaining the loyalty of its customer and distributor base.

67.     Unless the Debtor can take the measures requested by the motion to alleviate customer concerns, the Debtor believes that the bankruptcy filing itself may have some negative impact on customers' and distributors' attitudes towards the Debtor's products. In particular, if customers and distributors perceive that the Debtor is unable or unwilling to fulfill its prepetition obligations under and/or continue the Customer Programs, the Debtor's goodwill and business

relationships may erode. To prevent any such occurrence, the Debtor desires to honor and perform its prepetition obligations under and continue during the postpetition period those Customer Programs that were beneficial to its business and cost-effective during the prepetition period.

68.     For the forgoing reasons, the Debtor submits, and I believe, that the relief requested in the motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**G.     Motion of Debtor for Entry of Order Pursuant to 11 U.S.C. Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 and Federal Rules Bankruptcy Procedure, Rules 6003 and 6004 (I) Authorizing Debtor to Honor Certain Prepetition Obligations To Certain Critical Vendors; and (II) Continue Prepetition Practices with Certain Critical Vendors.**

69.     By this motion, the Debtor seeks to (i) honor certain undisputed prepetition obligations of vendors critical to Debtor's operations (the "Critical Vendors") in an aggregate amount not to exceed $450,000 and (ii) continue during the postpetition period its prepetition practices with certain Critical Vendors.

70.     The Debtor's ability to produce, market, and distribute these products and provide its customers with the same services that it has traditionally provided depends on its ability to produce extracts from raw coffee beans and tea leaves (the "Goods"), distribute its products to market (the "Distribution Services"), and provide maintenance services on liquid dispensers placed at operator locations (the "Dispenser Services"). The Debtor purchases its Goods, Distribution and Dispenser Services from a limited number of suppliers. The Critical Vendors include many of these suppliers.

71.     If the Debtor is unable to honor prepetition obligations to its Critical Vendors, the Debtor faces the real possibility that they may refuse to continue to deliver Goods and provide Distribution and Dispenser Services to Debtor. Because these Goods and Services are essential

to the operation of the Debtor's business and critical to maintaining the going-concern value of the Debtor's business and assets pending a successful reorganization, Debtor must ensure their continued availability.

72.     Furthermore, certain of the Critical Vendors rely heavily upon their business relationship with the Debtor.  If the Debtor fails to honor its Critical Vendor Claims, these Critical Vendors may be forced to cease their own operations, thereby eliminating critical and, in some circumstances, exclusive sources of certain Goods and Services for the Debtor — a result that would have a significant negative impact on the Debtor's operations and efforts to maximize the value of its estate in pursuit of a successful reorganization.

73.     For the forgoing reasons, the Debtor submits, and I believe, that the relief requested in this motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**H.     Motion for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-2 of the Local Rules Establishing Procedures for the Interim Compensation and Reimbursement of Expenses of Professionals**

74.     By this Motion, the Debtor requests, pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-2, entry of an order establishing procedures for the monthly allowance and payment of compensation and reimbursement of expenses for professionals whose retentions are approved by this Court pursuant to Sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to Sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) (collectively, the "Professionals").

75.     In addition, the Debtor seeks approval of procedures for reimbursement of reasonable out-of-pocket expenses incurred by members of any committee, should such a

committee be appointed in this case pursuant to Section 1102 of the Bankruptcy Code. The Debtor submits, and I believe, that such an order will streamline the professional compensation process and enable the Court, the United States Trustee for the District of Delaware (the "U.S. Trustee"), and all other parties in interest to closely monitor the costs of administration, forecast cash flows, and implement efficient cash management procedures. Moreover, these procedures will also allow the Court and the key parties in interest, including the U.S. Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

I.    **Debtor's Motion for Entry of an Order Pursuant to 28 U.S.C. Section 156(c), Bankruptcy Rule 2002(f) and Local Bankruptcy Rule 2002-1(f) Authorizing the Retention of Kurtzman Carson Consultants as Claims, Noticing, and Balloting Agent to Debtor**

76.    Debtor seeks authorization to retain Kurtzman Carson Consultants ("KCC") as its claims, noticing and balloting agent ("Agent"). Upon information and belief, KCC is an experienced Agent and is frequently used by debtors in large chapter 11 cases, including cases in this District, and I believe KCC is well qualified to serve as Agent in this case. The employment of KCC will also provide efficient management of the claims, noticing and balloting processes in this case, thereby leaving Debtor's management and advisors to focus on Debtor's reorganization efforts.

## CONCLUSION

In furtherance of the reorganization efforts, the Debtor respectfully requests that the orders granting the relief requested in the First Day Motions be entered.

Dated: January 24, 2011

Richard A. Gartrell
Chief Financial Officer
Javo Beverage Company, Inc.