# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JAVO BEVERAGE COMPANY, INC., | : | Case No. _____ |
| | : | |
| Debtor.[1] | : | |
| | : | |
| | : | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2 (I) AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING AND THE USE OF CASH COLLATERAL, (II) MODIFIYING THE AUTOMATIC STAY UNDER SECTION 362 OF THE BANKRUPTCY CODE, AND (III) SCHEDULING A FINAL HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF

Javo Beverage Company, Inc., as debtor and debtor in possession (the "Debtor" or the "Borrower," or the "Company") in the above-captioned chapter 11 case hereby files this motion (the "Motion") pursuant to sections 105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Interim Order"), in the form annexed hereto as Exhibit A, and a final order (the "Final Order" and, together with the Interim Order, the "Orders"), (a) authorizing and approving debtor-in-possession financing and the use of cash collateral pursuant to a financing arrangement (the "DIP Facility") with Coffee Holdings LLC, as lender ("Holdings" or the "DIP Lender") as provided for in that certain Senior Secured Super-Priority Debtor-in-Possession

---

[1]   The last four digits of the Debtor's federal tax identification number are 4292.  The Debtor's mailing address and corporate headquarters is 1311 Specialty Drive, Vista, California 92081.

Revolving Promissory Note (the "DIP Credit Agreement")[2] and the DIP Term Sheet, (b) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code, and (c) scheduling a final hearing and approving form and manner of notice thereof. In support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represents as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2.

## RELIEF REQUESTED

2.      By this Motion, the Debtor is seeking, inter alia:

- authorization for the Debtor to enter into a first priority senior secured revolving DIP Facility in an aggregate principal amount of $3,151,000 (the "DIP Commitment" and each individual loan thereunder, a "DIP Loan" and collectively, the "DIP Loans"), of which $500,000 plus interest and any and all other amounts accrued but unpaid on that certain secured revolving promissory note, dated January 6, 2011, issued prepetition to Holdings (in such capacity, the "Prepetition Lender") by the Borrower (the "Prepetition Loan"), shall be reserved for a dollar-for-dollar roll-up of, subject to entry of the Final Order;

- authorization for the Debtor to execute and deliver final documentation consistent with the DIP Credit Agreement and the DIP Term Sheet and to perform such other and further acts as may be necessary or appropriate in connection therewith, which final documents shall include without limitation (a) the DIP Credit Agreement among the Borrower and the DIP Lender and (b) other agreements, documents and instruments delivered or executed in connection with the DIP Term Sheet and the DIP Credit Agreement, all of which shall be in form and substance acceptable to the DIP Lender (such documentation, the "DIP Documents");

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order. To the extent that there is any conflict between this Motion, the DIP Credit Agreement, the DIP Term Sheet, and the Interim Order, the Interim Order shall control.

- authorization for the Debtor to (a) use the Cash Collateral (as defined below) pursuant to section 363 of the Bankruptcy Code, and all other Prepetition Loan Collateral (as defined below) and (b) provide adequate protection to Holdings;

- authorization to grant to the DIP Lender, subject to the Carve Out and the terms of the Interim Order, (a) on account of the DIP Loan (i) postpetition first priority liens on unencumbered assets of the Debtor, (ii) priming liens on collateral securing the Prepetition Loan (which was provided by the DIP Lender); (iii) junior liens on collateral securing other validly perfected prepetition indebtedness, (iv) superpriority administrative expense claims (defined in the Interim Order as the DIP Superpriority Claims); and (b) as adequate protection to the extent of diminution in value on account of the Prepetition Loan (i) replacement liens on collateral securing the DIP Loan, subordinate to the DIP Liens, (ii) superiority administrative expenses claims, subordinate to the DIP Superpriority Claims, and (iii) current payment of interest and fees under the Prepetition Loan;

- authorization for the DIP Lender to exercise remedies upon the occurrence and continuance of an Event of Default, including without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code;

- to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this Order authorizing the Borrower, on an interim basis, to borrow under the DIP Credit Agreement up to $1.2 million of the DIP Loans to be used for working capital, general corporate purposes, and (subject to the Final Order) the repayment and roll up of the Prepetition Loan of the Debtor in accordance with Debtor's budget attached hereto as Exhibit B (as such budget may be supplemented or modified in accordance with the terms hereof and the DIP Documents, the "Budget"); and

- to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the Borrower, on a final basis, to borrow under the DIP Credit Agreement the balance of the DIP Loans and authorizing and approving, on a final basis, the relief requested in the Motion.

## BACKGROUND

3.      On January 24, 2011 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No trustee, examiner, or creditors' committee has been appointed in this chapter 11 case.

5.      The Debtor is a manufacturer of coffee and tea-based dispensed beverages, drink mixes and flavor systems primarily for the food service industry. Since commencing production in late 2003, the Debtor has regularly suffered from a lack of sufficient working capital resources and has conducted capital raises in some form in every year since 2003 except for 2007. To date, the Debtor has yet to be profitable and cash inflows from operations have been insufficient to cover the company's expenditures.

6.      The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the Declaration of Richard A. Gartrell in Support of the Debtor's Chapter 11 Petition and First Day Pleadings (the "Gartrell Declaration"), and is incorporated herein by reference.

## A.      The Prepetition Indebtedness

7.      In an effort to relieve liquidity constraints, in October 2008, the Borrower entered into a Master Purchase and Sale Agreement ("Factoring Agreement") with Accord Financial, Inc. ("Accord") under which Accord agreed to advance up to 75 percent of the face amount of the company's accounts receivable. In addition, Accord loaned the Borrower an additional $595,000 as a term loan ("Term Loan"). In consideration of Accord's advances under the Factoring Agreement  and term loan, the Borrower granted Accord a security interest in essentially all of its assets except for the coffee dispensers (its accounts receivable, equipment (except its coffee dispensers), inventory and general intangibles). As of January 19, 2011, $1,324,761.84 was owed to Accord under the Factor Agreement and approximately $370,500 was owed to Accord, under the Term Loan.

8.     At or about that same time, the Borrower began to conduct a private placement offering dated December 2008 (the "PPO"), with individual accredited investors and pursuant to this offering, the Borrower borrowed $10.5 million from 46 individual investors. In exchange for the amount invested, investors received an 8-year unsecured senior subordinated note bearing quarterly interest at 10 percent ("Investor 10% Subordinated Notes") and 5 shares of unregistered common stock per dollar invested. The Borrower has failed to pay the quarterly interest that was due on the Investor 10% Notes on October 1, 2010, and January 1, 2011, aggregating $529,315. As of the Petition Date, the outstanding amount due on the Investor 10% Notes, including principal and interest, is approximately $11,095,480.

9.     Closing concurrently with the completion of the $10.5 million PPO noted above, the Borrower completed, on April 6, 2009, the sale of an 8-year unsecured senior subordinated note bearing interest at 10 percent in the principal amount of $12 million ("Holdings 10% Subordinated Notes," with the Investors Subordinated 10% Notes, the "10% Subordinated Notes") and 50 million shares of unregistered common stock for a purchase price of $12.5 million to Holdings. The Holdings Subordinated 10% Notes and Investor Subordinated 10% Notes are *pari passu*. As of the Petition Date, the outstanding amount due on the Holdings Subordinated 10% Notes, including principal and interest, is approximately $12,075,616.

10.     Following the completion of the 10% Note transaction, the Borrower continued to seek additional financing for the purchase of coffee dispensers without success. By late summer and fall of 2009, the Borrower, needing additional funds to operate, began discussions and negotiations with multiple institutional investors including Holdings and ultimately completed the sale to Holdings of a 66-month unsecured senior subordinated note in the principal amount of $4 million, bearing interest at 12 percent ("Senior PIK Notes") and 15 million shares of

unregistered common stock for a purchase price of $4.1 million for the purpose of meeting the Company's working capital needs. As provided in the PPO and the Investor 10% Notes, the Senior PIK Notes are "Senior Debt" and, accordingly, the Senior PIK Notes are senior to the 10% Subordinated Notes. As of the Petition Date, the outstanding amount due on the Senior PIK Notes, including principal and interest, is approximately $5,838,457.

11.     Just prior to the filing of this Chapter 11 Case, Holdings advanced the Company $500,000 pursuant to a Secured Promissory Note bearing interest at approximately 9.5%. Interest is due quarterly. The monies were necessary to fund operations, including payroll. The note is secured by a senior lien on approximately 3,000 coffee dispensers located throughout the country.

12.     In addition to the foregoing, as of the Petition Date, the Company had approximately $2.4 million in unpaid accounts payable, $1.4 million in purchase money financing (dispensers), and $100,000 in secured equipment loans.

13.     In summary, the following chart reflects the approximate amount of obligations of the Borrower as of the Petition Date:

**Secured Debt**:

| | |
|---|---|
| Accord Factor Agreement and Term Loan | $1,695,262 |
| Holdings Secured Promissory Note | 500,000 |
| Purchase Money Financing (dispensers) | 1,400,000 |
| Equipment loans | 100,000 |

**Senior Debt**:

| | |
|---|---|
| Senior PIK Notes | 5,838,457[3] |
| Accounts Payable | 2,400,000 |
| **Unsecured Subordinated Debt**: | |
| 10 % Subordinated Notes | 23,171,095[4] |
| **Total**: | $35,104,814 |

## B.   Events Leading to the Chapter 11 Filing

14.     Beginning in 2010, the Borrower began, once again, to have additional liquidity constraints.

15.     To permit alternatives to raise additional capital, at its annual meeting in June 2010, the Company's shareholders approved an increase in its authorized Common Stock to 400 million shares.

16.     In May, 2010, the then-Chairman and CEO resigned, and Stanley Greanias, a director nominated by Holdings pursuant to its rights under the PIK Note transaction, was appointed as interim CEO. During June and July 2010, Mr. Greanias and the executives of the Borrower worked on business strategies with a focus on identifying: (1) further opportunities to achieve revenue growth without the need for capital expenditures in the form of dispenser purchases, and (2) further opportunities for cost cutting within the company. In light of the Company's liquidity concerns and existing debt capitalization, discussions of additional capital needs led to exploration of a possible out of court capital restructuring.

---

[3]     For GAAP accounting purposes, the balance is reduced by debt premium which is amortized over 66 months.

[4]     For GAAP accounting purposes, the balance is reduced by debt premium which is amortized over 8 years.

17. In October 2010, the Borrower retained Valcor Consulting LLC ("Valcor") as its financial advisor to advise and assist it in analyzing its debt capacity relative to the Company's enterprise value and in renegotiating its debt obligations to levels appropriate to its debt capacity. The findings of Valcor indicated that the value and debt capacity of the enterprise was substantially exceeded by its overall debt obligations and it became evident that a restructuring under the Bankruptcy Code might be the Borrower's only practical alternative.

18. While continuing to search for and implement cost saving measures, the Borrower pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of the company's business.

19. In addition to seeking additional financing from Holdings, the Borrower sought interim and debtor-in-possession financing from certain holders of the Investor 10% Notes and Preferred Stock, as well as from Accord, commercial lenders and other lenders. Due to the lack of unencumbered assets and the value of the encumbered assets, none of the investors and/or financial institutions, other than Holdings, were interested in taking any further actions with respect to providing financing to the Borrower.

20. In early December 2010, the Company entered into negotiations with Holdings regarding interim financing, debtor-in-possession financing, and the terms of a plan of reorganization. After difficult negotiations, the Borrower and Holdings reached agreement on the terms of interim and debtor-in-possession financing which will allow the Company to continue to operate in the ordinary course while implementing a plan of reorganization that will deleverage the Company and provide the Company with sufficient working capital upon exit from bankruptcy.

## C. The Debtor-in-Possession Financing

21.     Holdings is a holder of 23% of the common stock of the Debtor and holds all of the Senior PIK Notes and 52% of the Subordinated 10% Notes. As a result of its familiarity with the Debtor, Holdings is uniquely positioned to provide the Debtor with financing not otherwise available to it in the capital markets. The Debtor and Holdings negotiated in good faith the proposed DIP Facility through separate and disinterested professionals, and the Debtor's board of directors approved the proposed financing without any influence from the DIP Lender. Ultimately, the Debtor decided that the proposal for debtor-in-possession financing advanced by Holdings was reasonable, the best available under the circumstances, and adequately addresses the Debtor's reasonably foreseeable working capital needs. The financing affords the Debtor an opportunity to reorganize and continue its operations during the chapter 11 case. The various terms, fees and charges required by Holdings under the DIP Credit Agreement are "market" and reasonable and appropriate under the circumstances.

22.     If this Motion is not approved and the Debtor does not obtain authorization to borrow under the DIP Documents, the Debtor and its estate will suffer immediate and irreparable harm. Without the funds available through the DIP Credit Agreement, the Debtor will be unable to provide working capital necessary to pay its employees and operate its business during its chapter 11 case, which would adversely affect the value of the Debtor's business and recoveries to creditors. As discussed in the Gartrell Declaration, given the Debtor's liquidity crisis, the filing of this case and the provision of postpetition financing to facilitate a standalone financial restructuring and de-leveraging of the Debtor's capital structure (which includes provisions for critical vendors, employees, and 100% of general unsecured trade claims) is absolutely vital to the Debtor's continued operations and ability to thrive as a going concern.

23.     For the foregoing reasons and the reasons set forth below, the DIP Credit

Agreement is in the best interest of the Debtor's estate, creditors, and other parties in interest,

and the Debtor requests approval thereof.

## THE DIP FINANCING

24.     <u>Principal Financing Terms</u>.  Consistent with Bankruptcy Rule 4001(c)(1) and this

Court's requirements under Local Rule 4001-2(a)(i) and (ii), the principal terms of the DIP

Credit Agreement and Interim Order are as follows:[5]

| | |
|---|---|
| Borrower: | Javo Beverage Company, Inc., a Delaware corporation (the "<u>Borrower</u>" or the "<u>Debtor</u>"). |
| DIP Lender: | Coffee Holdings LLC ("<u>Holdings</u>" or "<u>DIP Lender</u>") |
| DIP Facility: | A first priority senior secured revolving credit facility (the "<u>DIP Facility</u>") in an aggregate principal amount of $3,151,000 (the "<u>DIP Commitment</u>" and each individual loan thereunder, a "<u>DIP Loan</u>" and collectively, the "<u>DIP Loans</u>"), of which $500,000 plus interest and any and all other amounts accrued but unpaid on the Prepetition Loan (as defined below) shall be reserved for a dollar-for-dollar roll-up of the Prepetition Loan. |
| | Upon entry of the Interim Order, the Debtor shall be entitled to borrow up to $1,200,000 under the DIP Facility. |
| | Upon entry of the Final Order, the Debtor shall be entitled to borrow all amounts available under the DIP Facility. |
| Availability: | Upon satisfaction or waiver by the DIP Lender of conditions precedent to drawing to be specified in the DIP Credit Agreement, up to $3,151,000, representing (i) the applicable amount set forth in the Budget (exclusive of the Carve-Out, as defined below), (ii) amounts to repay the Prepetition Loan, and (iii) the Carve-Out.  All reserves against Availability under the DIP Credit Agreement shall be established in the sole discretion of the DIP Lender.  Borrowings may be made by the Borrower at any time after the Closing Date to, but excluding the business day preceding, the Maturity Date of the DIP Facility.  Amounts available under the DIP |

---

[5]     The terms and conditions of the DIP Credit Agreement set forth in this Motion are intended solely for
informational purposes to provide the Court and interested parties with a brief overview of the
significant terms thereof and should only be relied upon as such.  This summary is qualified in its
entirety by the provisions of the DIP Credit Agreement, DIP Term Sheet, and the Interim Order.  The
Debtor reserves all rights in connection with the Interim Order.  Unless otherwise specified, terms
have the same definitions as those in the DIP Credit Agreement.

Facility may be borrowed, repaid and reborrowed on and after the Closing Date until the Maturity Date subject to satisfaction or waiver of all related conditions precedent.

Use of Proceeds:

The proceeds of the DIP Loans shall be subject to, and used solely in a manner consistent with, the Budget (a) to repay the Prepetition Loan (subject to the Final Order), (b) to pay all interest, charges, fees and expenses (including attorneys' fees for counsel to the DIP Lender) under the DIP Loans, (c) to fund postpetition operating expenses and other general corporate needs, including working capital needs, (d) to pay certain administrative expenses of the Bankruptcy Case, including reasonable fees and expenses of professionals, (e) to pay court-approved critical vendors and (f) to make such other court-approved payments, in each case, contemplated by and consistent with the Budget.

Budget:

The initial budget shall be prepared and delivered by the Borrower on or prior to the Closing Date and shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances on a weekly basis from the Closing Date through May 1, 2011 and shall be in form and substance acceptable to the DIP Lender, and may be updated from time to time pursuant to amendments thereto as approved by the DIP Lender in its sole discretion (such budget, and each subsequent rolling 13-week budget delivered by the Borrower after the Closing Date, in each case, as so amended, the "Budget") as further set forth in the DIP Credit Agreement..

Closing Date:

The earlier of (i) the date upon which the conditions precedent set forth below have been satisfied and the initial DIP Loans are made pursuant to the Interim Order of the Bankruptcy Court and (ii) February 28, 2011 (the "Closing Date").

Maturity Date:

Earlier of: (i) the date on which all the DIP Loans have been indefeasibly repaid in full in cash and all of the DIP Commitments have been permanently and irrevocably terminated, (ii) no later than June 30, 2011, (iii) the date of the closing of a sale of all or substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code, (iv) a confirmed plan of reorganization for the Debtor pursuant to chapter 11 of the Bankruptcy Code, and (v) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default.

Cash Management:

The Borrower and the DIP Lender shall enter into a deposit account control agreement (the "Control Agreement") pursuant to which Holdings shall receive control over an existing Wells Fargo account of the Borrower (the "Cash Collateral Account"). The Control Agreement shall be in form and substance acceptable to the DIP Lender. Except as otherwise ordered by the Bankruptcy Court, all cash of the Borrower, including cash advanced under the DIP Loans, which is not otherwise subject to an existing valid and perfected lien, shall be deposited or received into the cash collateral account.

| | |
|---|---|
| Amortization: | No amortization shall be required with respect to the DIP Facility. |
| Pricing: | The DIP Loans will bear interest at a rate equal to the London Interbank Offered Rate ("LIBOR") plus 8.0%, with LIBOR subject to a floor of 1.5%. Interest will be payable monthly, in cash, in arrears, calculated on the basis of the actual number of days elapsed in a 360-day year. |
| Default Interest: | The then-applicable interest rate plus 2.0% per annum. |
| Commitment Fee: | The Borrower shall pay Holdings an up-front commitment fee of 3.0% of the aggregate amount of the DIP Commitment. |
| Mandatory Prepayments: | There will be no prepayment penalties for any prepayments (whether mandatory or optional) of the DIP Facility. |
| Optional Prepayments: | Permitted in whole or in part, with prior notice but without premium or penalty and including accrued and unpaid interest. |
| Application of Prepayments: | Prepayments will be applied: *first*, subject to entry of the Final Order, to repayment in cash of the Prepetition Loan; *second*, to reimbursable expenses of Holdings (including attorneys' fees), then due and payable pursuant to the DIP Agreement; *third*, to interest and other fees then due and payable on the DIP Facility on a *pro rata* basis; *fourth*, to the principal balance of borrowings outstanding under the DIP Facility on a *pro rata* basis until the same has been repaid in cash in full; and *fifth*, to any other obligations under the DIP Facility. |
| Security: | The DIP Facility will be secured by automatically perfected super-priority senior liens with respect to (i) any unencumbered assets of the Borrower (including, without limitation, inventory, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, real property, cash and proceeds of the foregoing) wherever located, now or hereafter owned, pursuant to section 364(c)(2) and (d) of the Bankruptcy Code and upon entry of the Final Order any avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), provided, that Holdings' liens on the proceeds of the Avoidance Actions will be split 50-50 with Accord Financial, Inc. ("Accord") pursuant to its debtor-in-possession factor funding (the "DIP Factor") being provided simultaneously with the DIP Facility (ii) assets securing the Prepetition Loan (collectively, the "Senior DIP Liens") and (iii) funds advanced by the DIP Lender in the Control Account (as defined in the DIP Facility). The Senior DIP Liens will be subject only to the Carve-Out. |
| | The DIP Facility also will be secured by junior liens (the "Junior DIP Liens") on all other assets of the Borrower that are subject to valid and perfected liens in existence at the time of commencement of the Bankruptcy Case or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code pursuant to section 364(c)(3) of the Bankruptcy Code, subject only to such senior valid and |

perfected liens and the Carve-Out.

| | |
|---|---|
| Ranking / Priority: | All obligations of the Borrower under the DIP Facility at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case (the "<u>DIP Administrative Claims</u>") under section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code; provided, that any distributions on the DIP Administrative Claims shall be shared equally between the DIP Lender and the DIP Factor, subject to subordination of the Carve-Out (as defined below). The DIP Administrative Claims are subject only to a carve-out for (i) allowed, accrued, but unpaid professional fees and expenses of the Borrower and professionals for any official committee of unsecured creditors (the "<u>Committee</u>") as set forth in the Budget (on a cumulative basis) incurred prior to an Event of Default not otherwise cured or waived by the DIP Lender, (ii) allowed, accrued, but unpaid professional fees and expenses of the Debtor incurred in the Bankruptcy Case after an Event of Default (that is not waived or cured) not to exceed an amount equal to $125,000, (iii) the payment of fees pursuant to 28 U.S.C. § 1930 and (iv) payment of other accrued and unpaid postpetition obligations owed by the Debtor incurred under the Budget prior to the occurrence of an Event of Default and allowable under section 503(b)(1)(A) of the Bankruptcy Code(collectively, the "<u>Carve-Out</u>").

The Carve-Out, cash collateral and any loans under the DIP Facility may be used by the Committee in an amount not to exceed $25,000 (the "<u>Investigation Funds</u>") to investigate (but not prosecute) the validity, perfection, priority, extent, or enforceability of the DIP Facility, the Prepetition Loan, or the liens or security interests securing such facilities (but not of the DIP Factor), or any claims against Holdings, provided that such investigation occurs within sixty (60) after appointment of such Committee. The right to use the Investigation Funds shall terminate upon the occurrence of an Event of Default. |
| Adequate Protection: | Pending entry of the Final Order, to the extent of diminution in value, the Interim Order shall grant to the Prepetition Lender replacement liens on DIP Collateral and superpriority claims on account of the Prepetition Loan, subject and subordinate only to the DIP Liens, DIP Superpriority Claims, and the Carve-Out, as the case may be. The Prepetition Lender shall also receive current payment of interest and fees under the Prepetition Loan (collectively with the replacement liens and superpriority claims, "<u>Adequate Protection</u>"). In the event that the Final Order does not grant a roll up or cross collateralization of the Prepetition Loan or if such roll up or cross collateralization is reversed, modified, or vacated, then the Final Order shall reinstate automatically the Adequate Protection granted to the Prepetition Lender pursuant to the Interim Order. |
| Conditions Precedent: | The DIP Credit Agreement contains conditions precedent for the |

extension of credit as usual and customary for financings of this kind.

Representations and Warranties: The DIP Credit Agreement contains representations and warranties as are usual and customary for financings of this kind.

Affirmative Covenants: The DIP Credit Agreement contains affirmative covenants as are usual and customary for financings of this kind.

Negative Covenants: The DIP Credit Agreement contains negative covenants as are usual and customary for financings of this kind.

Events of Default: Each of the following shall constitute Events of Default: (i) any representation or warranty made in the DIP Credit Agreement by the Borrower shall prove to have been false or misleading in any material respect when so made; (ii) the Borrower's failure to pay the principal amount of the DIP Loans on the Maturity Date or a date fixed for prepayment thereof or by acceleration thereof or otherwise; (iii) the Borrower's failure to pay any interest on the DIP Loans or any other amount due and payable pursuant to the DIP Loans; (iv) the Borrower's failure to perform or observe, as the case may be, the Affirmative Covenants and Negative Covenants provided for in the DIP Agreement; (v) one or more judgments or orders as to any obligation arising after the Petition Date in excess of $25,000 (to the extent not covered by independent third-party insurance) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (as defined in the DIP Credit Agreement) shall be rendered against the Borrower and shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower to enforce any such judgment; (vi) there shall have occurred a Change of Control (as defined in the DIP Credit Agreement); (vii) the appointment of an examiner with expanded powers or a trustee in the Debtor's chapter 11 case, conversion of the chapter 11 case to a case or cases under chapter 7 of the Bankruptcy Code or dismissal of the chapter 11 case by order of the Bankruptcy Court; (viii) the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder of any security interest to permit foreclosure (including by means of foreclosure under Article 9 of the Uniform Commercial Code and/or applicable state law) on any of the assets of the Borrower; (ix) any order of the Bankruptcy Court shall be entered staying, reversing or vacating any of the DIP Credit Facility, Interim Order, or DIP Term Sheet; (x) the termination or material breach of the Plan Commitment Letter Agreement, dated as of January 23, 2011 between the Borrower and Holdings, or the Restructuring Term Sheet; (xi) an event of default occurs under the postpetition financing provided to the Debtor by Accord Financial, Inc.; or (xii) Accord stops funding under the DIP Factor.

The Events of Default under the DIP Credit Agreement also include the failure of the Borrower to achieve any of the following "Milestones":

(i)(A) no later than January 24, 2011, to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the date of such filing, the "Petition Date") in the Bankruptcy Court; (B) no later than February 7, 2001 (the "Plan Filing Date"), to file a prearranged plan of reorganization (the "Plan") and disclosure statement (the "Disclosure Statement") with the Bankruptcy Court containing terms and conditions consistent with both the DIP Term Sheet and that certain Restructuring Term Sheet, dated January 23, 2001 (the "Restructuring Term Sheet") and otherwise reasonably acceptable to Holdings; (C) to obtain an order of the Bankruptcy Court approving (x) on an interim basis, the DIP Facility provided by Holdings within five business days following the Petition Date and (y) on a final basis, the DIP Facility within 35 calendar days following the Petition Date; (E) to obtain an order of the Bankruptcy Court approving the settlement agreement between the Debtor and Javo Dispenser, Inc., dated as of January 14, 2011, within 45 calendar days following the Petition Date, (F) to obtain entry of an order approving the Disclosure Statement by the Bankruptcy Court within 45 calendar days from the Plan Filing Date; (G) to obtain entry of an order by the Bankruptcy Court confirming the Plan (the "Confirmation Order") within 90 calendar days from the Plan Filing Date; and (H) to cause the "Effective Date" of the Plan to occur no later than 15 days after the entry of the Confirmation Order

Notwithstanding the foregoing Milestones, the Debtor and the DIP Lender together may agree otherwise.

An Event of Default would also include any action by the Borrower to seek to implement any transaction or series of transactions that would effect a restructuring on substantially different terms from those set forth in the DIP Term Sheet and the Restructuring Term Sheet unless otherwise agreed by Holdings.

Remedies:

Upon the occurrence of any of the above Events of Default, (i) Holdings may terminate the DIP Commitment and declare the DIP Loans then outstanding to be due and payable, together with accrued interest thereon and any unpaid accrued fees and expenses incurred by Holdings or its advisors, and all other obligations of the Borrower thereunder shall become forthwith due and payable, without presentment, demand or any other notice of any kind, all of which are hereby expressly waived (to the extent permitted by applicable law) by the Borrower, (ii) Holdings shall have the right to take all or any actions and exercise any remedies available to a secured party under the DIP Loans or applicable law or in equity subject to any requirements set forth in the Orders and (iii) the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated and Holdings shall have the right to exercise any of the remedies under the DIP Loans, including any rights and remedies provided in the Orders and the right to realize on all of the Collateral without relief or order of the Bankruptcy Court except as provided in the Orders.

| | |
|---|---|
| <u>Right to Credit Bid</u>: | Holdings' right to credit bid the DIP Loans and the Prepetition Loan under section 363 of the Bankruptcy Code or pursuant to the Plan shall be expressly reserved. |
| <u>Waivers and Amendments</u>: | Amendments and waivers of the provisions of the DIP Facility and other definitive credit documentation would require the approval of the DIP Lender. |
| <u>Fee Reimbursement</u>: | As reflected in the Budget, DIP Lender shall be entitled to monthly reimbursement of the reasonable fees and expenses of its counsel, arising from or related to the DIP Facility or the Bankruptcy Case. |
| <u>Financial Advisor</u>: | Holdings shall be entitled to retain a financial advisor, appraisers and other third-party consultants under the DIP Facility. |
| <u>Governing Law</u>: | New York. |

25. <u>Certain Federal Bankruptcy Rule Disclosures (DIP Financing)</u>. The matters described in Bankruptcy Rule 4001(c)(1)(B) are set forth in the following sections of the DIP Credit Agreement and proposed Interim Order:

(a) *Grant of Priority or a Lien on Property of the Estate.* <u>See</u> Interim Order ¶¶ 7 and 14; DIP Credit Agreement § 5.

(b) *Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case.* <u>See</u> Interim Order ¶ 14.

(c) *Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case.* <u>See</u> Interim Order ¶ 3.

(d) *Waiver or Modification of the Automatic Stay.* <u>See</u> Interim Order ¶¶ 11 and 12.

(e) *Waiver of Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use Cash Collateral, or Request Authority to Obtain Credit.*

Not applicable, but a request to use the DIP Lender's cash collateral or a request for authority to obtain credit in contravention of the terms of the proposed Interim Order would constitute an Event of Default thereunder. <u>See</u> Interim Order ¶¶ 9, 19, 22, and 24; DIP Credit Agreement § 9(a), (j).

(f) *Establishment of Deadlines for Filing a Plan, for Approval of a*

> *Disclosure Statement, for a Hearing on Confirmation Order, or for Entry of a Confirmation Order.* <u>See</u> Interim Order ¶ 10; DIP Credit Agreement § 8(m).

(g)   *Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.* <u>See</u> Interim Order ¶¶ 7, 11, 14(a), and 21.

(h)   *Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.* <u>See</u> Interim Order ¶¶ 3, 23.

(i)   *Indemnification of Any Entity.* Not applicable, but the Debtor would be required to pay the fees and expenses of the DIP Lender and its advisors and provides for certain limits of liability. <u>See</u> Interim Order ¶¶ 8, 14(c), 30, and 32; DIP Credit Agreement §§ 2(e), 7(b).

(j)   *Release, Waiver, or Limitation on Rights under 11 U.S.C. § 506(c).* Subject to entry of the Final Order, see Interim Order ¶ 16.

(k)   *Liens Granted on Claims Arising under Chapter 5 of the Bankruptcy Code.* Subject to entry of the Final Order, see Interim Order ¶ 7(a) and DIP Credit Agreement § 5(a).

26.   <u>Certain Local Rule Disclosures</u>.  In addition, Local Rule 4001-2 requires the disclosure of certain provisions of the DIP Credit Agreement and the Interim Order.  The following disclosures are intended to comply with the requirements of the Local Rules.  The Debtor believes that the following provisions are justified and necessary in the context and circumstances of this case.

(a)   *Local Rule 4001-2(a)(i)(A)* requires the disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors, and *Local Rule 4001-2(a)(i)(E)* requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(a) of the Bankruptcy Code.

At the Final Hearing, the Debtor will seek entry of the Final Order pursuant to which the obligations under the Prepetition Loan would be "rolled up" into obligations under DIP Loan would be

secured by the DIP Liens and DIP Superiority Claims. The Debtor believes such relief is justified under the circumstance of this case because (i) the DIP Lender provided the Prepetition Loan as bridge financing immediately prior to the Debtor filing this case, which enabled the Debtor to fund payroll and provide a smooth transition into bankruptcy, (ii) the DIP Lender will be lending more postpetition funds ($2.6 million) than prepetition funds ($500,000) and as such will not seek more than a dollar for dollar roll up, and (iii) the roll up was subject to good faith negotiation and a necessary inducement for the DIP Lender to extend necessary postpetition financing to sponsor the Debtor's restructuring.

(b) *Local Rule 4001-2(a)(i)(B)* requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition liens or the waiver of claims against the secured creditor without first giving parties in interest an opportunity to conduct an investigation.

The Interim Order would afford the Committee and other parties in interest a full and fair opportunity to investigate the claims and liens of the Prepetition Lender in connection with the Prepetition Loan, the Holdings 10% Notes, and the Holdings PIK Notes. The Interim Order and the Final Order would provide up to $25,000 for the Committee to investigate (but not prosecute or challenge) the validity of the liens granted under the Prepetition Loan or any other claim against Holdings, provided such investigation is completed within 60 days after appointment of the Committee. If no such claims are brought within 60 days of the Committee's appointment, or if no Committee is appointed, no party in interest with standing to bring such claims prosecutes such claims within 75 after entry of the Interim Order, the Debtor's estate would be deemed to have released and waived any such claims against Holdings. The Interim Order and the Final Order would grant the Committee standing to bring such claims, but any other party would have to obtain requisite standing. The Debtor submits that such provisions are necessary to obtain postpetition financing from the DIP Lender, which is funding and sponsoring the Debtor's standalone financial restructuring. See Interim Order ¶¶ 3, 23, and 30.

(c) *Local Rule 4001-2(a)(i)(C)* requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.

The Final Order would provide for a waiver of rights under section

506(c) of the Bankruptcy Code with respect to any collateral held by the DIP Lender. Given that the DIP Lender is funding the Carve Out, agreeing to fund first day payment of certain critical vendors, and committing to pay a substantial portion allowed general unsecured trade claims under the Plan that it is sponsoring, the Debtor believes that this provision is necessary and appropriate in the context of this case. <u>See</u> Interim Order ¶ 16.

(d)     *Local Rule 4001-2(a)(i)(D)* requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.

Although the Interim Order would not grant the DIP Lender a lien on the proceeds of Avoidance Actions, the Final Order would grant such a lien (subject to the proceeds sharing provisions with Accord). The Debtor believes such a provision is fair and appropriate given that the DIP Lender is funding a portion of the Carve Out to investigate any potential claims against it, is agreeing to pay certain critical vendors and pay a substantial portion allowed general unsecured trade claims under the Plan for which it is acting as sponsor, and holds a substantial portion of general unsecured claims that the Debtor believes will be asserted against its estate. <u>See</u> Interim Order ¶ 7(a).

(f)     *Local Rule 4001-2(a)(i)(F)* requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.

Payment of the professional fees for the Debtor and the Committee prior to the occurrence of an Event of Default will be subject to a Budget estimated to pay all allowed fees and expenses reasonably expected to be incurred in a case of this size and complexity. Following an Event of Default, only professionals for the Debtor would have a Carve Out of $125,000 on account of their allowed fees and expenses. The Debtor submits that such a provision is fair in the context of this case as it would not expect the Committee to incur any allowed fees following an Event of Default. <u>See</u> Interim Order § 6(b).

(g)     *Local Rule 4001-2(a)(i)(G)* requires the disclosure of provisions that prime any secured lien without the consent of that lienor.

The Interim Order only primes the liens of the Prepetition Lender with respect to the collateral securing the Prepetition Loan, and the Prepetition Lender consents to such treatment provided it is

granted adequate protection as disclosed above and set forth in the Interim Order.  See Interim Order §§ 7(b); 14

27.  Certain Bankruptcy Rule Disclosures (Cash Collateral).  With respect to the use of Cash Collateral, the matters described in Bankruptcy Rule 4001(b)(1)(B) are set forth in the following sections of the Interim Order.

(a)  *Name of Each Entity with an Interest in the Cash Collateral.* Interim Order ¶ (I); 18.

(b)  *Purpose and Use of Cash Collateral.*  Interim Order ¶ 19.

(c)  *Material Terms of Use of Cash Collateral.*  Interim Order ¶ 19.

(d)  *Liens, Cash Payments, or other Adequate Protection to be Provided.*  Interim Order ¶ 14.

## BASIS FOR RELIEF

**A.  The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

28.  As set forth above, the Debtor's ability to maximize the value of its estate and continuing operating hinges upon its being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  11 U.S.C. § 364(c).

29.  Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit

elsewhere and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).

30.     Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

31.     The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate super-priority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. See In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

32.     In furtherance of this approach, courts consider a number of factors, including, without limitation:   (a) whether alternative financing is available on any other basis (e.g., whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business; (c) whether the terms of the

proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors. See In re Aqua Assocs., 123 B.R. 192 (Bankr. E.D. Pa 1991); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987); Bland v. Farmworker Creditors, 308 B.R. 109, 113–14 (S.D. Ga. 2003). Each of these considerations has been met here.

**(i)     The DIP Credit Facility Represents the Best Financing Available and Should be Approved**

33.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

34.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D.

Ga. 1989); <u>see also</u> <u>In re Garland Corp.</u>, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); <u>In re Stanley Hotel, Inc.</u>, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); <u>In re Ames Dep't Stores</u>, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

35.    As discussed above, the Debtor has effectively solicited proposals for financing from various institutions and engaged in diligence efforts in an effort to secure debtor-in-possession financing on the best terms available.  The Debtor simply was unable to procure satisfactory alternative financing on terms as good, or better, than those provided by the DIP Lender, who is familiar with the Debtor's business and the only party willing to extend junior financing.  Moreover, given the Debtor's liquidity crisis, the Debtor believes that proposal offered by the DIP Lender, which is tied to a financial restructuring of the Debtor's capital structure in which the DIP Lender holds a substantial stake, is the best available to the Debtor and will provide it with sufficient runway to effectuate a de-leveraging of its capital structure so as to exit from chapter 11 as a more viable, healthy corporate enterprise.  Accordingly, the Debtor's efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

**(ii)    The DIP Credit Facility Is Necessary to Preserve the Assets of the Debtor's Estate**

36.    As debtor in possession, the Debtor has a fiduciary duty to protect and maximize the estate's assets.  <u>See</u> <u>In re Mushroom Transp. Co., Inc.</u>, 382 F.3d 325, 339 (3d Cir. 2004); <u>Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery</u>, 330 F.3d 548, 573 (3d Cir. 2003).  The DIP Credit Facility, if approved, will provide essential working capital, allowing

the Debtor to continue operating in the ordinary course during its bankruptcy case before its plan of reorganization is confirmed. Without the DIP Credit Facility, the Debtor will be unable to preserve the going-concern value of its estate and to continue operating, thereby endangering the success of this chapter 11 case.

37.     Accordingly, the DIP Credit Facility is necessary to preserve the assets of the Debtor's estate.

**(iii)     The Terms of the DIP Documents Are
         Fair, Reasonable, and Adequate Under the Circumstances**

38.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions.

39.     The DIP Facility negotiated in good faith and at arm's-length among the Debtor and the DIP Lender through separate counsel and non-insider officers and directors, culminating in a carefully crafted agreement designed to maintain the Debtor's business as a going concern pending a reorganization of the company. Given the urgent needs of the Debtor to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Facility are the best available. Indeed, when viewed in its totality, the DIP Credit Agreement reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and supported by fair consideration.

40.     In addition, the proposed Interim Order and DIP Credit Agreement provide that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out.  In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  Id. at 40.

**(iv)     The Debtor's Proposed Adequate Protection Is Appropriate**

41.     To the extent a secured creditor's interest in the collateral constitutes a valid and perfected security interest and lien as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor-in-possession financing facility.  See 11 U.S.C. § 364(d)(1)(B).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

42.     Here, the Debtor is only seeking to prime the liens granted under the Prepetition Loan as the DIP Lender will only take a junior lien on other collateral subject to valid, perfected, and unavoidable liens existing on the Petition Date or otherwise perfected in accordance with section 546(b) of the Bankruptcy Code.

43.     The DIP Lender consents to the priming of its prepetition lien if it is granted the adequate protection as proposed in the Interim Order.  The proposed adequate protection is

typical under the circumstances of this case and cases like it. In particular, the Debtor is seeking authority to grant as adequate protection against diminution in value of the Prepetition Loan replacement liens on the DIP Collateral and superpriority administrative expense claims, subject and subordinate only to the Carve Out, DIP Liens, and DIP Superpriority Claims, as well as current payment of interest and fees on account of the Prepetition Loan. In addition, at the Final Hearing, the Debtor will seek to roll up the obligations under the Prepetition Loan by using the proceeds of the DIP Facility to pay off and discharge the obligations under the Prepetition Loan. The Debtor believes that the proposed roll up of the Prepetition Loan is a necessary and fair inducement of the DIP Lender to provide postpetition credit.

**(v)     The Debtor Has Exercised Its Business Judgment in Entering Into the DIP Credit Facility**

44.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

45.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and

not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys. Inc., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

46.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14.

47.     As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Credit Agreement and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Term Sheet. The DIP Credit Facility contain terms that are the best available under the circumstances and was negotiated and approved by non-insiders, who were not influenced by the DIP Lender (and the DIP Lender did not participate in the Debtor's decision to approve DIP Financing).

48. The funds provided by the DIP Credit Agreement are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this chapter 11 case. Indeed, failure to obtain approval of the DIP Credit Agreement will materially irreparably harm the going-concern value of its business which, in turn, will adversely affect the value ultimately received by stakeholders.

49. Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lender on the secured and administrative super-priority basis described herein.

**B.     The Debtor's Request for Use of Cash Collateral is Appropriate**

50. The Debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

51. Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtor to use cash collateral as long as the applicable secured creditors consent or are adequately protected. See In re McCormick, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). "Cash Collateral" is defined as, "cash, negotiable instruments, documents

of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

52.     The Debtor has an urgent need for the immediate use of the cash collateral pending the final hearing on this Motion and seeks to use all cash collateral existing on or after the Petition Date.  The Debtor requires the use of the cash collateral to, among other things, to continue operating and maintain the going concern value of its assets pending it reorganization. Accord Financial, Inc. and the DIP Lender consent to the Debtor's use of the cash collateral upon the terms and conditions set forth in the Orders.  Moreover, courts in this district have granted similar relief in other recent chapter 11 cases.  See, e.g., In re Aleris Int'l, Inc., Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009); In re Motor Coach Indus. Int'l, Inc., No. 08-12136 (BLS) (Bankr. D. Del. Oct. 7, 2008); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. March 7, 2008); In re Buffets Holdings, Inc., No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Pope & Talbot, Inc., No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007).

**C.     The Automatic Stay Should Be Modified**

53.     The relief requested herein contemplates a modification of the automatic stay under section 362 of the Bankruptcy Code to permit the DIP Lender to exercise upon the occurrence and during the continuance of an event of default and after three (3) business days' written notice thereof, all rights and remedies under the DIP Credit Agreement and Interim Order.  Stay modifications of this kind are ordinary and standard features of postpetition financing and are, in the Debtor's business judgment, reasonable and fair under the present circumstances.

**INTERIM APPROVAL OF THE DIP CREDIT FACILITY**

54.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain

credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

55. Given the immediate and irreparable harm to be suffered by the Debtor absent interim relief, the Debtor respectfully requests that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement.

## NO PRIOR REQUEST

56. No prior request for the relief sought herein has been made to this or any other court.

## NOTICE

57. Notice of this Motion has been given to: (i) the largest creditors listed in the Debtor's list of unsecured creditors; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) the DIP Lender; (iv) counsel to the DIP Lender; (v) Accord Financial and its counsel; (vi) the Internal Revenue Service; (vii) all known parties that may be asserting a lien against the DIP Collateral; (viii) all appropriate state taxing authorities; and (ix) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules (collectively, the "Initial Notice Parties"). The Debtor submits that, under the circumstances, no further notice of the hearing on the interim financing is necessary and requests that any further notice be dispensed with and waived.

58. The Debtor further respectfully requests that the Court schedule the Final Hearing and authorize it to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to (i) the Initial Notice Parties; (ii) any party that has filed prior to such date a request for notices with this Court; and (iii) counsel for any official committee(s). The Debtor requests that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtor will seek approval at the Final Hearing a waiver of rights under Bankruptcy Code section 506(c), to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as <u>Exhibit A</u>; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems just and proper.

Dated: January 24, 2011        Respectfully submitted,
       Wilmington, Delaware

Robert J. Dehney, (DE No. 3578)
Matthew B. Harvey (DE No. 5186)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 425-4673
Email: rdehney@mnat.com
       mharvey@mnat.com

-and-

Debra A. Riley (CA No. 151925)
ALLEN MATKINS LECK GAMBLE MALLORY
   & NATSIS LLP
501 West Broadway, 15th Floor
San Diego, CA 92101-3541
Telephone: (619) 233-1155
Facsimile: (619) 233-1158
Email: driley@allenmatkins.com

*Proposed Counsel for Debtor and*
*Debtor in Possession*