# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---

In re:

JAVO BEVERAGE COMPANY, INC.,

Debtor.[1]

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 11-10212 (BLS)

---

## DISCLOSURE STATEMENT PURSUANT TO
## SECTION 1125 OF THE BANKRUPTCY CODE FOR
## CHAPTER 11 PLAN OF REORGANIZATION
## OF JAVO BEVERAGE COMPANY, INC.

[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.]

Debra A. Riley
Allen Matkins Leck Gamble
    Mallory & Natsis LLP
501 West Broadway, 15th Floor
San Diego, CA 92101-3541
Telephone:    619-233-1155
Facsimile:    619-233-1158

Robert J. Dehney (DE Bar No. 3578)
Matthew B. Harvey (DE Bar No. 5186)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone:    302-658-9200
Facsimile:    302-658-3989

Counsel to the Debtor
and Debtor-in-Possession

Dated: February 9, 2011

---

[1]    The last four digits of Debtor's federal tax identification number are 4292. Debtor's mailing address and corporate headquarters is 1311 Specialty Drive, Vista, California 92081.

JAVO BEVERAGE COMPANY, INC. ("DEBTOR", "JAVO" OR "COMPANY") BELIEVES THAT ITS CHAPTER 11 PLAN OF REORGANIZATION DATED FEBRUARY 9, 2011, ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT (AS THE SAME MAY BE AMENDED OR MODIFIED, THE "<u>PLAN</u>"), IS IN THE BEST INTERESTS OF CREDITORS. ALL CREDITORS ENTITLED TO VOTE ARE URGED TO VOTE IN FAVOR OF THE PLAN.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN (AS SUCH TERM IS DEFINED ABOVE). NO REPRESENTATIONS HAVE BEEN AUTHORIZED CONCERNING THE DEBTOR, ITS BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS INCLUDED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

[The Bankruptcy Court has approved this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of creditors to make an informed judgment as to whether to accept or to reject the Plan.] APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT OR A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE, TO THE BEST KNOWLEDGE, INFORMATION, AND BELIEF OF THE DEBTOR. THIS DISCLOSURE STATEMENT INCLUDES PROJECTIONS AND OTHER STATEMENTS THAT CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, BY THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. "FORWARD-LOOKING STATEMENTS" IN THE PROJECTIONS AND ELSEWHERE INCLUDE THE INTENT, BELIEF, OR CURRENT EXPECTATIONS OF THE DEBTOR AND MEMBERS OF ITS MANAGEMENT TEAM AND/OR OTHERS WITH RESPECT TO, AMONG OTHER THINGS, THE TIMING OF, COMPLETION OF, AND SCOPE OF THE CURRENT CONTEMPLATED RESTRUCTURING, THE PLAN, FINANCING, MARKET CONDITIONS, AND THE DEBTOR'S FUTURE LIQUIDITY AND OPERATIONS, AS WELL AS THE ASSUMPTIONS ON WHICH SUCH STATEMENTS ARE BASED. WHILE THE DEBTOR BELIEVES THAT THE EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS WITHIN THE BOUNDS OF ITS KNOWLEDGE OF ITS BUSINESS AND OPERATIONS, PARTIES-IN-INTEREST ARE CAUTIONED THAT ANY SUCH "FORWARD-LOOKING STATEMENTS" ARE NOT GUARANTEES OF FUTURE PERFORMANCE AND INVOLVE RISKS AND UNCERTAINTIES, AND THAT ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY SUCH "FORWARD-LOOKING STATEMENTS."

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION AND SUMMARY OF THE PLAN**.................................1

    A.    Overview of the Plan ..................................................................1

    B.    Voting ..................................................................................4

    C.    Solicitation Process....................................................................4

    D.    Voting Procedures......................................................................5

    E.    Confirmation Hearing .................................................................6

    F.    Objection to Confirmation ...........................................................7

**ARTICLE II. GENERAL BACKGROUND** ..................................................7

    A.    Description of the Debtor's Business ...............................................7

    B.    Prepetition Organizational Structure................................................9

    C.    Prepetition Capital Structure.........................................................9

    D.    Assets of the Company ..............................................................12

        1.    Lack of Working Capital ...............................................13

        2.    Prepetition Restructuring Efforts ......................................13

    E.    Enterprise Value of Company.......................................................14

        1.    Comparable Public Company Analysis ..................................16

        2.    Discounted Cash Flow Analysis .........................................16

    F.    The Plan Commitment Letter.......................................................17

**ARTICLE III. EVENTS DURING THE BANKRUPTCY CASE** ......................................18

    A.    Commencement of the Bankruptcy Case.............................................18

    B.    Motions, Applications and Other Pleadings Filed on or shortly after the Petition Date...........................................................................19

    C.    Settlement with Javo Dispenser LLC ...............................................20

    D.    Retentions Applications.............................................................20

E.     Schedules and Claims Bar Date ........................................................21

F.     Cash Collateral, DIP Factor, and DIP Loan..................................21

     1.     Accord Financial (DIP Factor)...............................................21

     2.     Holdings (DIP Lender) ...........................................................21

**ARTICLE IV. SUMMARY OF THE PLAN**.................................................21

     1.     Unclassified Claims (not entitled to vote on the Plan) ...........22

     2.     Unimpaired Classes of Claims (deemed to have accepted the Plan and not entitled to vote on the Plan) ...............................22

     3.     Impaired Classes of Claims (entitled to vote on the Plan)......22

     4.     Classes Interests .....................................................................22

**ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS** ...........................23

A.     Unclassified Claims ......................................................................23

     1.     Administrative Claims .............................................................23

     2.     Professional Fee Claims...........................................................23

     3.     Tax Claims ..............................................................................23

     4.     DIP Factor Secured Claims......................................................24

     5.     DIP Facility Secured Claims....................................................24

B.     Unimpaired Claims .......................................................................24

     1.     Class 1:  Other Priority Claims ...............................................24

     2.     Class 4:  Other Secured Claims ...............................................24

     3.     Class 5:  Convenience Class Claims ........................................24

C.     Impaired Claims ............................................................................25

     1.     Class 2:  Prepetition Factor Secured Claims............................25

     2.     Class 3:  Bunn-O-Matic Secured Claims.................................25

# TABLE OF CONTENTS

3.     Class 6: General Unsecured Claims ..................................................... 25

4.     Class 7: Senior Notes Claims .......................................................... 25

5.     Class 8: Subordinated Notes Claims ................................................ 26

D.     Interests ........................................................................................ 26

    1.     Class 9: Old Preferred Stock ..................................................... 26

    2.     Class 10: Old Common Stock .................................................... 26

    3.     Class 11: Old Warrants and Options ........................................... 26

E.     Allowed Claims; Deemed Allowed Claims ....................................... 27

F.     Retention of Causes of Action/Reservation of Rights ........................ 27

G.     Setoffs .......................................................................................... 27

H.     Objections to Claims ....................................................................... 27

**ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN** ................................. 28

A.     Impaired Classes of Claims Entitled to Vote .................................... 28

B.     Acceptance by Impaired Classes of Claims ...................................... 28

C.     Presumed Acceptance of Plan .......................................................... 28

D.     Deemed Non-Acceptance of Plan ..................................................... 28

E.     Voting Classes ............................................................................... 28

F.     Non-Consensual Confirmation ........................................................ 28

**ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN** ............................ 29

A.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor ....................................................................... 29

B.     Plan Implementation Steps .............................................................. 29

C.     Exit Financing ............................................................................... 30

D.     Debt and Equity After Emergence .................................................. 30

# TABLE OF CONTENTS

E.      Cancellation of Securities and Agreements ..........................................................30

F.      Directors.................................................................................................................30

G.      Officers ..................................................................................................................30

H.      Employment Contracts...........................................................................................31

I.      Section 1145...........................................................................................................31

J.      The Shareholders Agreement.................................................................................31

K.      Effectuating Documents; Further Transactions .....................................................31

**ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS**....................................31

A.      Distributions...........................................................................................................31

B.      Distribution Record Date .......................................................................................32

C.      Exchange Agent .....................................................................................................32

D.      Unclaimed Distributions ........................................................................................32

E.      Prepayments...........................................................................................................32

F.      Cash Payments ......................................................................................................32

G.      Withholding and Reporting Requirements .............................................................33

**ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................................................33

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.....................................................................................................................33

B.      Insurance Policies ..................................................................................................34

C.      Cure Amounts ........................................................................................................34

D.      Deemed Assumption Subject to Revocation..........................................................34

E.      Payment of Cure Amounts.....................................................................................34

F.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................................................................................................................35

# TABLE OF CONTENTS

Page

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................... 35

    A.    Conditions to Confirmation .............................................. 35

    B.    Conditions to the Effective Date ...................................... 35

    C.    Waiver of Conditions ....................................................... 36

**ARTICLE XI. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS** ........................................................ 36

    A.    Professional Fee Claims .................................................. 36

**ARTICLE XII. EFFECTS OF CONFIRMATION** ..................................... 37

    A.    Binding Effect .................................................................. 37

    B.    Discharge of All Claims and Interest ............................... 37

    C.    Term of Bankruptcy Stay and Injunctions ...................... 38

    D.    Compromise and Settlement of Claims, Interests, and Controversies ................ 38

    E.    Satisfaction of Subordination Rights ............................. 38

    F.    Debtor Release ................................................................ 39

    G.    Release by Holders of Claims and Interests .................... 39

    H.    Exculpation ..................................................................... 40

    I.    Injunction ........................................................................ 40

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................. 41

    A.    Retention of Jurisdiction ................................................. 41

    B.    Failure of Court to Exercise Jurisdiction ....................... 41

    C.    Dissolution of Creditors' Committee ............................. 41

**ARTICLE XIV. MISCELLANEOUS PLAN PROVISIONS** ...................... 42

    A.    Modification of Plan ....................................................... 42

# TABLE OF CONTENTS

Page

B. Debtor Withdrawal of Plan ................................................................42

C. Holdings Withdrawal of Plan..............................................................42

D. Effect of Withdrawal or Modification of Plan....................................42

E. Successors and Assigns......................................................................42

F. Payment of Statutory Fees .................................................................42

G. Notices ...............................................................................................43

H. Severability of Plan Provisions..........................................................44

I. Exhibits. .............................................................................................44

J. No Admissions ...................................................................................44

**ARTICLE XV. CONFIRMATION** ................................................................44

A. Acceptance ........................................................................................45

B. Feasibility...........................................................................................45

C. Best Interests Test; Liquidation Analysis ..........................................46

D. Compliance with Applicable Provisions of the Bankruptcy Code ....47

**ARTICLE XVI. CERTAIN RISK FACTORS TO BE CONSIDERED**............47

1. Objection to Classifications ...................................................47

2. Risk of Non-Confirmation of the Plan...................................47

3. Risk of Not Meeting Projections............................................48

**ARTICLE XVII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** .................48

A. Allocation of Consideration to Interest...............................................49

**ARTICLE XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**.................................................49

**ARTICLE XIX. CONCLUSIONS AND RECOMMENDATION** .......................50

# TABLE OF EXHIBITS

Exhibit A     Chapter 11 Plan of Reorganization

Exhibit B     Balance Sheet as of January 23, 2011

Exhibit C     Balance Sheet as of December 31, 2010

Exhibit D     10Q as of September 30, 2010

Exhibit E     Plan Commitment Letter

Exhibit F     Liquidation Analysis

# ARTICLE I.

## INTRODUCTION AND SUMMARY OF THE PLAN



This Disclosure Statement is being furnished by the Debtor to all known holders of Claims of the Debtor pursuant to Section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Chapter 11 Plan of Reorganization of Javo Beverage Company, Inc., dated February 9, 2011, a copy of which appears as Exhibit A to this Disclosure Statement. The purpose of this Disclosure Statement is to provide sufficient information to enable creditors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan. Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Plan. The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement.

### A.     Overview of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors and shareholders. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against, and equity interests in, a debtor's bankruptcy estate.

The Plan provides for (i) the emergence of the Debtor from chapter 11 bankruptcy as a Reorganized Debtor and the re-vesting of the Debtor's assets in the Reorganized Debtor free and clear of any liens, encumbrances or other interests (except as otherwise provided in this Plan), (ii) the resolution of all outstanding Claims against and Interests in the Debtor, and (iii) the recapitalization of the Debtor's capital structure which will provide the working capital the Debtor needs to continue to serve its customers.

The Plan divides most Claims against, and Interests in, the Debtor into Classes. Certain claims, in particular Administrative Claims and Priority Tax Claims, remain unclassified in accordance with Section 1123(a)(1) of the Bankruptcy Code. The Plan assigns all other Claims and Interests into 11 classes.

The following table briefly summarizes the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  The table also identifies the Class entitled to vote on the Plan under the rules established by the Bankruptcy Code.

| Class [Allowed Claim or Interest] | Treatment | Estimated Amount of Claims in Class[2] | Recovery | Status |
| --- | --- | --- | --- | --- |
| N/A [Administrative Claims] | Payment in full, in Cash, or as otherwise agreed, or, if incurred in the ordinary course, in accordance with the terms and conditions of any agreements relating thereto. | Undetermined | 100% | Unclassified and not entitled to vote |
| N/A [DIP Facility Secured Claim] | Satisfied in full with estimated 27.9% of New Common Stock of the Reorganized Debtor | Estimated at $3,051,000[3] | 100% | Unclassified and not entitled to vote |
| N/A [DIP Factor Secured Claim] | Treatment to be agreed upon by the DIP Factor, Debtor and Holdings | Estimated at $2,025,018 | 100% | Unclassified and not entitled to vote |
| N/A [Priority Tax Claims] | Payment in full, in Cash, on the Effective Date or over five years as allowed under section 1129(a)(9)(C) | $142,000 | 100% | Unclassified and not entitled to vote |
| Class 1 [Other Priority Claims] | Payment in full, in Cash, or as otherwise agreed. | Undetermined | 100% | Unimpaired; deemed to have accepted the Plan and not entitled to vote |
| Class 2 [Prepetition Factor Secured Claim ] | Treatment to be agreed upon by the DIP Factor, Debtor and Holdings | $315,811[4] | 100% | Impaired; entitled to vote |

---

[2]  "Estimated Amount of Claims in Class" refers to Claims within a given Class as determined based on, among other things, the Debtor's Schedules.  This presentation does not reflect amounts already paid or that may be paid prior to the Effective Date of the Plan pursuant to the critical vendor and customer Orders or other Orders of the Court.  The Debtor reserves the right to dispute, or assert offsets or defenses to, any Claim as to amount, liability or status regardless of whether it was included in the Estimated Amount of Claims in Class set forth above.  All amounts stated have been rounded to the nearest whole dollar.

[3]  Includes $500,000 in principal amount of prepetition secured debt for which the Debtor has sought to be paid and discharged under the terms of the DIP Facility.

[4]  Under terms of Dip Factor Agreement, the amount owed as of the Petition Date of $1,459,816 will have been paid during Reorganization Case.

| Class [Allowed Claim or Interest] | Treatment | Estimated Amount of Claims in Class[2] | Recovery | Status |
|---|---|---|---|---|
| Class 3 [Bunn-O-Matic Secured Claims] | Payment on the Effective Date of $379,140.20; a promissory note in the amount of $814,300.18, payable in three equal installments every two months commencing on the last day of the second month following the Effective Date until paid, bearing interest at 8% per annum | $1,193,440 | 100% | Impaired; entitled to vote |
| Class 4 [Other Secured Claims] | Treatment that ensures Claims are unimpaired, including reinstatement of original contract or agreement | $12,455 | 100% | Unimpaired; deemed to have accepted the Plan and not entitled to vote |
| Class 5 [Convenience Class Claims] | Payment in full, in Cash, on the Effective Date | $168,000 | 100% | Unimpaired; deemed to have accepted the Plan and not entitled to vote |
| Class 6 [General Unsecured Claims] | Promissory Note in the amount of Allowed Claim to be paid in 2 semi-annual payments of principal and interest, commencing 6 months after the Effective Date, bearing interest at 8% per annum | Approx. $2,250,000 (less paid during case as Critical Vendor or Customer Program Payments, or otherwise cured on the Effective Date as part of executory contract) | 100% | Impaired; entitled to vote |
| Class 7 [Senior Note Claims] | Satisfied in full with estimated 53.3% of New Common Stock of the Reorganized Debtor | $5,841,755 | 100% | Impaired; entitled to vote |
| Class 8 [Subordinated Note Claims] | Satisfied in full with estimated 18.8% of New Common Stock of the Reorganized Debtor | $23,171,095 | Estimated 9.8% to 9% | Impaired; entitled to vote |
| Class 9 [Old Preferred Stock] | Cancelled, extinguished and discharged. | N/A | 0% | Impaired, deemed to have rejected the Plan and not entitled to vote |
| Class 10 | Cancelled, extinguished and | N/A | 0% | Impaired, deemed to |

| Class [Allowed Claim or Interest] | Treatment | Estimated Amount of Claims in Class[2] | Recovery | Status |
|---|---|---|---|---|
| [Old Common Stock] | discharged | | | have rejected the Plan and not entitled to vote |
| Class 11 [Old Warrants and Options] | Cancelled, extinguished and discharged | N/A | 0% | Impaired, deemed to have rejected the Plan and not entitled to vote |

## THE DEBTOR, THE PROPONENT OF THE PLAN SUPPORTS CONFIRMATION OF THE PLAN.

### B. Voting

Any holder of a Claim or holder of an Interest whose legal, contractual, or equitable rights are altered, modified, or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."

Only Entities who hold Claims that are impaired under the Plan and are not deemed to have rejected the Plan are entitled to vote on the Plan. Classes 2, 3, 6, 7, and 8 are deemed impaired, and the votes from holders of Claims in those Classes will be solicited with respect to the Plan.

### C. Solicitation Process

The Court has appointed Kurtzman Carson Consultants as the official balloting agent in connection with the Reorganization Case (the "Balloting Agent")

The following documents and materials will constitute the Debtor's "Solicitation Package":

- PLAN,

- DISCLOSURE STATEMENT,

- ORDER APPROVING THE DISCLOSURE STATEMENT AND RELATED SOLICITATION PROCEDURES ("DISCLOSURE STATEMENT ORDER"),

- NOTICE OF THE HEARING AT WHICH CONFIRMATION OF THE PLAN WILL BE CONSIDERED ("CONFIRMATION HEARING NOTICE"),

- APPROPRIATE BALLOT AND VOTING INSTRUCTIONS, AND

- PRE-ADDRESSED, POSTAGE PREPAID RETURN ENVELOPE.

The Debtor intends to distribute the Solicitation Packages no fewer than twenty-five (25) calendar days before the Voting Deadline. The Debtor submits that distribution of the Solicitation Packages at least twenty-five (25) calendar days prior to the Voting Deadline and at least twenty-five (25) days prior to the objection deadline will provide the requisite materials to holders of Claims entitled to vote on the Plan in compliance with Bankruptcy Rules 3017(d) and 2002(b).

The Solicitation Package (including ballots and voting instructions) will be distributed to holders of Claims in Classes 2, 3, 6, 7 and 8 as of the Petition Date and in accordance with the procedures for Solicitation established by the Court. The Solicitation Package may be obtained by (i) calling the Balloting Agent at _____ or (ii) writing to the Balloting Agent at the following addresses:

> **If via delivery by U.S. Mail, hand, courier, or overnight service:**
>
> **Javo Beverage Co. Claims Processing Center**
> **c/o Kurtzman Carson Consultants LLC**
> **2335 Alaska Ave.**
> **El Segundo, CA 90245**

Copies of the materials (other than the Ballots) are available and may be examined by interested parties: (i) at the website maintained for this case at the address www.kccllc.net/JavoBevCo, (ii) at the office of the clerk of the Court, 824 North Market Street, Wilmington, Delaware 19801 between the hours of 8:00 a.m. and 3:00 p.m. (ET), or (iii) on the Court's electronic docket of this case at the address www.deb.uscourts.gov.

Other non-voting parties entitled to receive the Solicitation Packages, will be served paper copies of the order approving the Disclosure Statement, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan, the Confirmation Hearing Notice.

D.     **Voting Procedures**

Only Entities who hold Claims on the Voting Record Date and certain other parties specified by the Bankruptcy Court, are entitled to receive a copy of this Disclosure Statement and all of the related materials.

**The Voting Deadline is 4:00 p.m. prevailing Eastern Time on April ___, 2011**. To ensure that a vote is counted, holders of Claims in Classes 2, 3, 6, 7 and 8 must: (a) complete the Ballot; (b) indicate a decision either to accept or reject the Plan; and (c) sign and return the Ballot to the address set forth on the enclosed pre-addressed envelope provided in the Solicitation Package or by delivery by first-class mail, overnight courier, or personal delivery, so that all Ballots are **actually received** no later than the Voting Deadline, by the Balloting Agent at the address below.

ANY BALLOT THAT IS PROPERLY EXECUTED BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR

INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIM WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. IF YOU CAST MORE THAN ONE BALLOT VOTING THE SAME CLAIM ON OR BEFORE THE VOTING DEADLINE, THE LAST BALLOT RECEIVED BEFORE THE VOTING DEADLINE WILL BE DEEMED TO REFLECT YOUR INTENT AND THUS WILL SUPERSEDE ALL PRIOR BALLOTS.

| **BALLOTS** |
| --- |
| Ballots must be **actually received** by the Balloting Agent by the Voting Deadline at the following address: |
| **Javo Beverage Co. Claims Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Ave.<br>El Segundo, CA 90245** |
| If you have any questions on the procedures for voting on the Plan, please contact _____ or _____ at the Balloting Agent at the following telephone number:<br><br>_____ |

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTOR DETERMINES OTHERWISE.**

Prior to deciding whether and how to vote on the Plan, each holder in a voting Class should consider carefully all of the information in this Disclosure Statement, especially the risk factors described herein.

**E.     Confirmation Hearing**

The Bankruptcy Court will hold the Confirmation Hearing commencing at ___ **a.m. Eastern Time, on April 28, 2011,** at the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), 824 Market Street, Courtroom No. 1, Wilmington, Delaware 19801, or such other location as the Bankruptcy Court directs, before the Honorable Brendon L. Shannon, United States Bankruptcy Judge. The Confirmation Hearing may be adjourned from time to time without further notice. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained from the Classes entitled to vote, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been

previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to confirm the Plan, and (v) grant such other and further relief as the Bankruptcy Court deems reasonable and appropriate.

### F. Objection to Confirmation

Any objection to confirmation of the Plan must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and served in a manner so as to be received on or before April ___, 2011 at 4:00 p.m. Eastern Time by the following parties: (i) the Debtor, Javo Beverage Company, Inc., 1311 Specialty Drive, Vista, California 92081 (Attn: William E. Marshall); (ii) counsel for the Debtor, Allen Matkins Leck Gamble Mallory & Natsis LLP, 501 West Broadway, 15th Floor, San Diego, California 92101 (Attn: Debra A. Riley), *and* Morris, Nichols, Arsht & Tunnel LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney and Matthew B. Harvey); (iii) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801; (vi) counsel to the Committee, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Paul N. Heath); (v) counsel to the DIP Lender, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, (Attn: Brian E. Greer) *and* Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899, (Attn: William Bowden); and (vi) counsel to the DIP Factor, Moore & Van Allen PLLC, 40 Calhoun Street, Suite 300, Charleston, South Carolina 29401, (Attn: David Wheeler) *and* The Rosner Law Group LLC, 824 Market Street, Suite 810, Wilmington, Delaware 19801, (Attn: Frederick B. Rosner). Only objections made in writing and timely filed and received in accordance with the procedures above will be considered.

## ARTICLE II.

## GENERAL BACKGROUND

### A. Description of the Debtor's Business

The Company was originally incorporated in the State of Washington as North West Converters, Inc., on February 9, 1987. In June 1999, the Company changed its name to La Jolla Fresh Squeezed Coffee Co., Inc., and the Company then acquired the assets of Stephen's Coffee, Inc. and merged with Stephen's Coffee Holding, Inc. In February 2000, the Company acquired all the outstanding shares of Sorisole Acquisition Corp. to become successor issuer to Sorisole pursuant to Rule 12g-3 of the Securities Exchange Act of 1934 and subject to the reporting requirements of the Securities & Exchange Commission ("SEC"). In June 2002, the Company reincorporated from the State of Washington to the State of Delaware and simultaneously changed its name from La Jolla Fresh Squeezed Coffee Company, Inc., to Javo Beverage Company, Inc. In September 2008, Sorisole was dissolved. The Company's headquarters and manufacturing facility are located in Vista, California.

Javo is a manufacturer of coffee and tea-based dispensed beverages, drink mixes and flavor systems primarily for the food service industry. Javo has successfully commercialized a proprietary brewing technology that yields fresh brewed coffees and teas that are flavorful, concentrated and stable under refrigeration. As a result, they have broad applications in the food

service, food manufacturing and beverage industries. For food service industry customers, Javo manufactures and markets concentrated coffees, teas and specialty beverages that have the convenience and efficiency of dispenser-based systems. For food and beverage processors and retailers looking for authentic coffee and tea flavors for their packaged foods and ready-to-drink beverages, Javo supplies customized beverage formulations, extracts, and flavors.

Below are photos of two types of dispensers used by Javo customers to dispense coffee and tea-based beverages.



DISPENSER SPECIFICATIONS (LCR-2)

| Product Cabinet Capacity | 2 - 1 gal BIB |
| Refrigeration | Compressor Type R134a |
| Serving Flow Rate | 1.8 oz per second or 2.4 oz per second |
| Dispense (5 oz) Cups Per Hour | 128 / 384 cup/hr with 70° inlet water temp |
| Dispense Gallons Per Hour | 5 / 15 gal/hr With 70° F inlet water temp |
| Ratio Range | 25:1 to 65:1 |
| Programming Options | Continuous & Portion Option (0 to 640 oz) |
| Sanitation Requirements | Weekly Pull Handle Operation |
| Voltage Availability | 120 Volts / 220 Volts |
| Required Amperage | 15 Amps / 30 Amps |
| Heater Wattage | 1500 / 4500 Watts |
| Plumbing Requirement | 3/8" OD 1.5 gpm water line flow |
| Dispenser Dimensions | 39" H x 12" W x 25" D |
| Shipping Weight | 114 lbs |
| Agency Listings | ETL to NSF and UL Standards |

Dual Electrical Power Option



DISPENSER SPECIFICATIONS (LCC-2LP)

| Product Cabinet Capacity | 2 - .5 gal BIB |
| Refrigeration | Thermoelectric Chiller |
| Serving Flow Rate | 1.7 oz per second |
| Dispense (5 oz) Cups Per Hour | 120 Cups with 70° Inlet water temp |
| Dispense Gallons Per Hour | 4.6 Gallons With 70° F inlet water temp |
| Ratio Range | 25:1 to 50:1 |
| Programming Options | Continuous & Portion Option (0 to 640 Oz) |
| Sanitation Requirements | Weekly Push Button Operation |
| Voltage Availability | 120 Volts |
| Required Amperage | 12 Amps |
| Heater Wattage | 1425 Watts |
| Plumbing Requirement | 3/8" OD 1.5 gpm water line flow |
| Dispenser Dimensions | 23.7" H x 15.75" W x 20.9" D |
| Shipping Weight | 65 lbs |
| Agency Listings | ETL to NSF and UL Standards |

The Company distributes its products through multiple, well-established food distribution methods. Javo's dispensed, on-demand coffee and tea beverages utilize broad-line food service distributors that supply a complete range of food, beverage, and consumables to food service operators. The Company continues to expand the number of national and regional distributors established to deliver its beverage concentrates to restaurants in the United States and its products are currently stocked at distribution centers operated by Sysco Foods, US Foodservice, Gordon Foods, Shamrock Foods, McLane, Core-mark, EBY Brown, Dawn Foods and other broad-line and specialty distributors. These distributors purchase Javo's products, manage inventories, process orders and deliver products as needed by the Company's food service customers. In the case of chain restaurant operators, designated captive distribution providers operate in a similar fashion. Javo's distributors deliver its bag-in-box products to the end user, typically a hospital, casino, hotel or convenience store. These deliveries typically accompany regular orders placed for other restaurant supplies. The end user places the product into a dispenser—usually supplied by Javo—and serves fresh hot and/or iced coffee to their customers, employees and/or patients. Javo supplies its industrial flavor systems to its food and beverage manufacturing customers by shipping bulk extracts directly to the food processing location. These flavor systems represent a relatively small percentage of the Company's overall sales. Javo has several significant direct competitors for its dispensed hot coffee business offerings in

the United States, the largest being Douwe Egberts® Coffee Systems, a brand of Sara Lee Corporation. Most competitors offer either frozen products (in order to overcome extract shelf-life and stability limitations) or ambient, "shelf stable" products that rely on more aggressive processing and preservatives to maintain their shelf life. The Company's ability to offer freshly produced, refrigerated extracts gives it a competitive advantage in the market for on-demand coffee that is increasingly quality and flavor conscious.

**B.     Prepetition Organizational Structure**

As of January 15, 2011, the authorized capital stock of the Company consists of (a) 400,000,000 shares of common stock ("Old Common Stock"), of which as of that date, 302,771,121 shares are issued and outstanding, 96,112,445 shares are reserved and available for issuance pursuant to the Company's stock option and purchase plans, and 1,116,434 shares are reserved for issuance, (b) 5,850,000 shares of undesignated preferred stock, of which as of the date hereof, none are issued and outstanding, (c) 150,000 shares of Series A Junior Participating Preferred Stock, par value $0.001 per share, of which as of the date hereof, none are issued and outstanding, and (d) 4,000,000 shares of Series B Preferred Stock, par value $0.001 per share ("Old Preferred Stock"), of which as of the date hereof, 2,599,020 shares are issued and outstanding.

Cede & Co holds 147,084,141 shares (48.6%) of the Old Common Stock. The Old Common Stock is listed on the Over the Counter Bulletin Board.

The Company's current board of directors is composed of 7 directors, 2 of whom were nominees of Coffee Holdings LLC ("Holdings"), a holder of 23 percent of the Old Common Stock and holder of unsecured notes aggregating approximately $17 million.

As of December 31, 2010, the Company employed 57 full-time employees. The Company also uses outside consultants, brokers and other independent contractors from time to time. None of its employees are represented by a union.

**C.     Prepetition Capital Structure**

Between 2002 and 2005, the Company raised $14.7 million in a series of offerings in exchange for notes bearing interest of 10 percent payable on maturity and from between 3 and 5 shares of common stock for every dollar invested depending on the offering. The notes matured 60 months after issuance in a balloon payment of principal and accrued interest at 10 percent simple interest. Due to the inability to pay the notes as they were beginning to come due in May 2006, the Company offered to exchange the notes for Old Preferred Stock. The Old Preferred Stock paid a dividend of 10 percent annually in cash or additional Old Preferred Stock, at the election of the Company. In addition, the Old Preferred Stock carried a liquidation preference of $10 per share and required mandatory redemption at such liquidation preference in the event of a change in control. Pursuant to the exchange offer, in or about June 2006, $13,750,000 plus accrued interest or approximately 94 percent of the 60-month notes were converted to Old Preferred Stock. Since that time, the Company has elected to issue every annual dividend on the Old Preferred Stock in the form of additional shares of Old Preferred Stock. As noted above, 2,599,020 shares are issued and outstanding with a liquidation

preference of approximately $26 million. The notes that were not exchanged were paid by the Company.

In December 2006, the Company raised approximately $21 million in a convertible debt transaction in which it could repay interest and principal in the form of Old Common Stock subject to certain terms and conditions including a minimum required public trading price for its Old Common Stock.

In late 2008, due to liquidity needs and in response to its inability to service the convertible debt in the form of equity issuances due to the public stock price, the Company sought to raise $30 million in debt in order to retire the convertible bonds and to provide additional capital. The Company had completed principal negotiations and due diligence with a prospective institutional investor in the fall of 2008; however, due to the international financial crisis, this transaction failed to be consummated.

During its efforts to complete the $30 million transaction and in an effort to relieve liquidity constraints, in October 2008, the Company entered into a Master Purchase and Sale Agreement with Accord Financial, Inc. ("Prepetition Factor") under which the Prepetition Factor agreed to advance up to 75 percent of the face amount of the Company's accounts receivable. As of Petition Date, approximately $1,459,816 was owed to Prepetition Factor on its prepetition factoring line. In addition, Prepetition Factor loaned the Company an additional approximately $595,000 as a term loan ("Term Loan"). In consideration of Prepetition Factor's advances and term loan, the Company granted Prepetition Factor a security interest in its accounts receivable, equipment (except its coffee dispensers), inventory and general intangibles. As of Petition Date, approximately $370,500 was owed to Prepetition Factor under the Term Loan.

Following the failure of the $30 million debt transaction, the Company began to conduct a private placement offering dated December 2008 (the "PPO"), with individual accredited investors and pursuant to this offering, the Company ultimately borrowed $10.5 million from 46 individual investors. In exchange for the amount invested, investors received an 8-year unsecured senior subordinated note bearing quarterly interest at 10 percent ("Investor Subordinated Unsecured Notes") and 5 shares of unregistered common stock per dollar invested. The Investor Subordinated Unsecured Notes are interest only for the first 3 years. Thereafter, principal is payable in 20 equal quarterly payments over the remaining 5 years, along with quarterly accrued interest. The Investor Subordinated Unsecured Notes do not have default provisions and cannot be accelerated. As provided in the PPO and the Investor Subordinated Unsecured Notes, the holders agreed to subordinate to "Senior Debt," defined, among other things, as an unsecured credit facility entered into following the issuance of the Investor Subordinated Unsecured Notes that by its terms is senior in payment to the Investor Subordinated Unsecured Notes. The Company failed to pay the quarterly interest that was due on the Investor Subordinated Unsecured Notes on October 1, 2010, and January 1, 2011, aggregating $529,315. As of the Petition Date, the outstanding amount due on the Investor Subordinated Unsecured Notes, including principal and interest, was $11,095,479.

Closing concurrently with the completion of the $10.5 million PPO noted above, the Company completed, on April 6, 2009, the sale of an 8-year unsecured senior subordinated note bearing interest at 10 percent in the principal amount of $12 million ("Holdings Subordinated

Unsecured Note," with the Investors Subordinated Unsecured Notes, the "Subordinated Unsecured Notes") and 50 million shares of unregistered common stock for a purchase price of $12.5 million to Holdings. Like the Investor Subordinated Unsecured Notes, the Holdings Subordinated Unsecured Notes are interest only for the first 3 years which is paid quarterly. Thereafter, principal is payable in 20 equal quarterly payments over the remaining 5 years, along with quarterly accrued interest. The Holdings Subordinated Unsecured Notes do, however, contain representations and warranties, change in control, default provisions and other terms, including covenants limiting the amount of future indebtedness that could be incurred by the Company. The Holdings Subordinated Unsecured Notes and Investor Subordinated Unsecured Notes are *pari passu*. As of the Petition Date, the outstanding amount due on the Holdings Subordinated Unsecured Notes, including principal and interest, is approximately $12,075,616.

A substantial portion (approximately $11 million) of the net proceeds of the Subordinated Unsecured Notes were used to redeem—at a discount—approximately $13 million of the outstanding convertible notes and associated warrants issued in December 2006 per a negotiated discounted redemption agreement.

Following the completion of the Subordinated Unsecured Note transaction, the Company continued to seek additional financing for the purchase of dispensers without success. By late summer and fall of 2009, the Company, needing additional funds to operate, began discussions and negotiations with multiple institutional investors including Holdings and ultimately completed the sale to Holdings of a 66-month unsecured senior subordinated note in the principal amount of $4 million, bearing interest at 12 percent ("Senior Unsecured Notes") and 15 million shares of unregistered common stock for a purchase price of $4.1 million for the purpose of meeting the Company's working capital needs. The transaction also committed Holdings to take, at the Company's option and subject to certain conditions, additional notes and shares as payment for quarterly interest due on its Holdings Subordinated Unsecured Notes up to an aggregate amount of $3.5 million. The Company has elected to use the PIK from this $3.5 million commitment each quarter beginning with the interest due on April 1, 2010, which has resulted in approximately $1.2 million of additional Senior Unsecured Notes and related shares being issued. The Senior Unsecured Notes were structured to work within—and, as to debt for general uses, effectively used up—the allowable debt limits provided in the debt covenants in Holdings Subordinated Unsecured Note transaction. As provided in the PPO and the Investor Subordinated Unsecured Notes, the Senior Unsecured Notes are "Senior Debt." As of the Petition Date, the outstanding amount due on the Senior Unsecured Notes, including principal and interest, is approximately $5,841.755.

Just prior to the filing of this Chapter 11 Case, Holdings advanced the Company $500,000[5] pursuant to a Secured Promissory Note bearing interest at 8 percent plus the greater of 3-month LIBOR or 1.50 percent. Interest is due quarterly. The monies were necessary to fund operations, including payroll. Without such money, the Company may have been forced to shut down. The note is secured by a senior lien on approximately 3,000 coffee dispensers located throughout the country.

---

[5] Holdings advanced $100,000 on or about January 10, 2011, and the remaining $400,000 on or about January 13, 2011.

In addition to the foregoing, as of the Petition Date, the Company had approximately $2.4 million in unpaid accounts payable, $1.2 million in purchase-money financing for dispensers, and approximately $12,500 in secured equipment loans.

In summary, the following chart reflects the approximate amount of obligations of the Company as of the Petition Date:

| | |
|---|---|
| **Secured Debt:** | |
| Accord Factor Agreement and Term Loan | $1,695,262 |
| Holdings Secured Promissory Note | 500,000 |
| Purchase Money Financing (dispensers) | 1,200,000 |
| Equipment loans | 12,455 |
| **Senior Debt:** | |
| Senior Unsecured Notes | 5,841,755 |
| Accounts Payable | 2,400,000 |
| **Unsecured Debt:** | |
| Subordinated Unsecured Notes | <u>23,171,095</u> |
| **Total:** | <u>$34,820,567</u> |

## D.    Assets of the Company

As of the Petition Date, the book value of the Company's assets was $14,519,000. The assets were primarily comprised of Cash in the amount of $175,000, Accounts Receivable of $2,301,000, inventory of $677,000, and fixed assets, net of depreciation of $8,735,000. Included in the fixed assets are approximately 6,100 dispensers that are located throughout the United States with a net book value of $7,127,000. In connection with the Factor Term Loan in March 2010, the Company's fixed assets, not including the dispensers, were appraised. The appraisal valued the equipment at $752,000. Based on the Company's past practices of the resale of dispensers, the Company believes that the market value of the dispensers is approximately $2,400,000 (6,100 at $400). Assets also include approximately $2 million of intangible assets relating to loan fees incurred in connection with the Subordinated Unsecured Notes and Senior Unsecured Notes transaction. Pursuant to GAAP, these costs are being amortized over the term of the respective Notes. Attached as <u>Exhibits B and C</u>, respectively, are the unaudited balance sheets of the Company as of December 31, 2010 and January 23, 2010. Attached as <u>Exhibit</u> D is a copy of the Company's 10Q for quarter ending September 30, 2010.

Events Leading to the filing of the Bankruptcy Case

1.    *Lack of Working Capital*

Since commencing production in late 2003, the Company has regularly suffered from a lack of sufficient working capital resources and has conducted capital raises in some form in every year since 2003 except for 2007. Despite yearly growth in revenue and strong gross profit margins, the Company's primary business of dispensed coffee products is a niche market. While the Company has helped develop this market, this process has required substantial capital investment into liquid dispensers in order to fuel growth. To date, the Company has yet to be profitable and cash inflows from operations have been insufficient to cover the Company's expenditures and substantial principal and interest payments (which have included payment of the interest on the Subordinated Unsecured Notes), as shown by the following chart:

| Javo Beverage Company, Inc. | | | | | | |
|---|---|---|---|---|---|---|
| **Annual in 000's** | | | | | | |
| **PERIOD ENDING** | **30-Sep-10** | **31-Dec-09** | **31-Dec-08** | **31-Dec-07** | **31-Dec-06** | **31-Dec-05** |
| **Gross Revenue** | 19,642 | 23,097 | 19,561 | 12,607 | 10,322 | 6,200 |
| Returns & Allowances | 3,819 | 4,409 | 2,385 | 957 | (387) | (145) |
| **Net Sales** | 15,823 | 18,688 | 17,176 | 11,650 | 10,709 | 6,345 |
| | | | | | | |
| Cost of Revenue | 9,178 | 10,962 | 11,224 | 8,505 | 6,811 | 4,181 |
| | | | | | | |
| **Gross Profit** | 6,645 | 7,727 | 5,952 | 3,145 | 3,511 | 2,019 |
| | | | | | | |
| Total Operating Expenses | 10,248 | 14,291 | 13,641 | 10,251 | 6,315 | 4,052 |
| | | | | | | |
| **Operating Income or Loss Before Non-Cash Expenses** | (3,604) | (6,564) | (7,689) | (7,105) | (2,804) | (2,032) |
| Added Non-Cash | | | | | | |
| Depreciation & Amtz | 2,738 | 3,305 | 1,895 | 507 | 310 | 266 |
| Stock Issed for Services Amtz | 538 | 120 | 378 | | | |
| Deferred Compensation/Option Expense | 296 | 951 | 1,447 | 965 | - | - |
| | | | | | | |
| **Operating Income or Loss** | (32) | (2,189) | (3,969) | (5,633) | (2,494) | (1,766) |
| Total Other Income/Expenses Net | 26 | 1,977 | 2,817 | 5,857 | 426 | 44 |
| | | | | | | |
| Earnings Before Interest And Taxes | (3,578) | (4,588) | (4,872) | (1,248) | (2,378) | (1,988) |
| Interest Expense | | | | | | |
| Interest Expense | 2,415 | 2,817 | 1,587 | 1,702 | 2,163 | 2,856 |
| Interest Expense - Non-Cash Discount Senior Convertible Debt | 2,013 | 6,253 | 4,311 | 4,499 | 187 | - |
| Accelerated Interest & Discount re Converted of Preferred Stock | - | - | - | - | 5,198 | - |
| Total Interest Expense | 4,428 | 9,070 | 5,898 | 6,200 | 7,548 | 2,856 |
| **Net Income (Loss)** | (8,005) | (13,658) | (10,770) | (7,449) | (9,926) | (4,844) |

2.    *Prepetition Restructuring Efforts*

Beginning in 2010, the Company began to have additional liquidity constraints. Having issued and outstanding Old Common Stock very close to its total authorized Old Common Stock,

at its annual meeting in June 2010, the Company's shareholders approved an increase in its authorized Old Common Stock to 400 million shares, which allowed the Company the necessary stock to use the $3.5 million PIK commitment from Holdings and permit it further alternatives to raise additional capital.

On May 26, 2010, the then-Chairman and CEO resigned, and Stanley Greanias, a director nominated by Holdings pursuant to its rights under the Senior Unsecured Note transaction, was appointed as interim CEO. Ron Beard, an existing director, was appointed as Chairman of the Board. During June and July 2010, Mr. Greanias and the executives of the Company worked on business strategies with a focus on identifying: (1) further opportunities to achieve revenue growth without the need for capital expenditures in the form of dispenser purchases, and (2) further opportunities for cost cutting within the Company. Cost saving measures included, beginning in September 2010, voluntary 15-20% salary cuts for the executives and reallocation of duties in response to the loss of certain employees rather than replacement of those employees.

In light of the Company's liquidity concerns and existing debt capitalization, discussions of additional capital needs led to exploration of a possible out-of-court capital restructuring. In October 2010, the Company retained Valcor as its financial advisor to advise and assist it in analyzing its debt capacity relative to the Company's enterprise value and in renegotiating its debt obligations to levels appropriate to its debt capacity. The findings of Valcor indicated that the value and debt capacity of the enterprise was substantially exceeded by its overall debt obligations and it became evident that a restructuring under the Bankruptcy Code might be the Company's only practical alternative.

While continuing to search for and implement cost saving measures, the Company pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of the Company's business. In addition to seeking additional financing from Holdings, the Company's largest investor, the Company sought interim and debtor-in-possession financing from certain holders of the Investor Subordinated Unsecured Notes and Old Preferred Stock, as well as from the Prepetition Factor, commercial lenders and other lenders.

In early December 2010, the Company entered into negotiations with Holdings regarding interim financing, debtor-in-possession financing, and the terms of a plan of reorganization. After arduous negotiations, the Company and Holdings reached agreement on the terms of debtor-in-possession and exit financing in the aggregate amount of $6 million which would allow the Company to continue to operate in the ordinary course while implementing a plan of reorganization that will deleverage the Company and provide the Company with sufficient working capital upon exit from bankruptcy. Attached as <u>Exhibit</u> **E** is a copy of the Plan Commitment Letter between the Company and Holdings.

**E.    Enterprise Value of Company**

As noted above, in connection with developing strategic alternatives, the Debtor requested Valcor to perform a valuation analysis of the Debtor as a going concern. Based upon, and subject to, the review and analysis described herein, including the assumptions, limitations, and qualifications described herein, Valcor's view, as of December 22, 2010, was that the

estimated total enterprise value of the Reorganized Debtor as a going concern, as of an assumed Effective Date of June 30, 2011, would be between $15 million and $21 million. Based upon this range and other considerations, including the discussion below, for purposes of the Plan, the Debtor believes that a total enterprise value of $16,500,000 ("Total Enterprise Value") is appropriate. The Debtor understands that Holdings supports this valuation for purposes of the Plan, which is premised on consummation thereof, but that Holdings reserves its right to assert that such valuation is significantly lower in the event the Plan is not consummated.

Valcor's views are necessarily based on the economic, monetary, market, and other conditions as in effect on, and the information available as of the date of, its analysis (December 22, 2010).

Valcor's analysis is based, at the Debtor's direction, on a number of assumptions, including, among other assumptions, that (i) the Debtor would file a voluntary chapter 11 petition on or about January 21, 2011; (ii) the Debtor would obtain $6 million of financing or additional capital in the form of debtor in possession and exit financing at a nominal rate of 10% per annum.; (iii) the Debtor would remain in bankruptcy for approximately five months and emerge from chapter 11 upon confirmation of a plan of reorganization before June 30, 2011. In addition, Valcor assumed that there would not be a material change in economic, market, financial, and other conditions as of the assumed Effective Date. Valcor made no representation as to the achievability or reasonableness of such assumptions.

Valcor's valuation was based on the Debtor's five-year financial forecast beginning January 1, 2011. Valcor assumed, at the Debtor's direction, that the information supplied by the Debtor was reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtor's management and correctly reflected the Debtor's past operating results and current condition in accordance with generally accepted accounting principles, unless otherwise noted. Valcor also assumed that the Debtor's financial forecast was reasonably accurate and reliable.

In conducting its analysis, Valcor, among other things: (i) reviewed certain publicly available business and financial information relating to the Debtor that Valcor deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, assets, liabilities, and prospects of the Reorganized Debtor, including the financial forecast furnished to Valcor by the Debtor; (iii) conducted discussions with members of senior management and representatives of the Debtor concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtor's business and prospects before and after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data, including valuation multiples, for certain other companies in lines of business that Valcor deemed relevant; and (vi) conducted such other financial studies and analyses and took into account such other information as Valcor deemed appropriate. In connection with its review, Valcor did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Valcor and, with the consent of the Debtor, relied on such information being complete and accurate in all material aspects. In addition, at the direction of the Debtor, Valcor did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Debtor.

In preparing its valuation, Valcor performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Valcor, which consisted of (i) a comparable public companies analysis; and (ii) a discounted cash flow analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Valcor. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.

*1.     Comparable Public Company Analysis*

The comparable public company valuation analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Debtor, for example, comparable lines of business, business risks, growth prospects, market presence, and size and scale of operations. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to the Debtor's financial projections to imply an enterprise value for the Reorganized Debtor. Valcor determined multiples for each selected company's revenue, gross profit, and EBITDA and applied the derived multiples, respectively, to the Debtor's expected 2011 revenue, gross profit, and EBITDA. At the assumed Effective Date, and assuming the Debtor's calendar year 2011 forecast materializes as projected, the revenue, gross profit, and EBITDA on June 30, 2011, will include one-half actual and one-half forecast data. The basis for using this data is set forth in case law of the United States Bankruptcy Court for the District of Delaware. Although the selected companies were used for comparison purposes, no selected company is either identical or directly comparable to the business of the Debtor. Accordingly, Valcor's comparison of the selected companies to the business of the Debtor and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Debtor. The selection of appropriate companies for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information. The lack of publicly traded manufacturers of coffee and tea concentrates, drink mixes, and flavor systems comparable to the Debtor made the selection of companies for comparison to the Debtor challenging.

*2.     Discounted Cash Flow Analysis*

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Valcor's DCF analysis relied on the Debtor's five-year operating forecast of its debt-free, after-tax cash flows for the period beginning on July 1, 2011, the day following the assumed Effective Date, and ending on June 30 of each forecast year. Valcor then estimated a terminal value for the period after the five-year operating forecast. These cash flows and estimated terminal value were then discounted at a range of weighted average costs of capital, which are determined by reference to, among other things, the average cost of debt and equity of selected publicly traded companies.

The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

The estimated Total Enterprise Value represents the hypothetical enterprise value of the Reorganized Debtor as the continuing operator of its business and assets, after giving effect to the transactions contemplated by the Plan, based on certain valuation methodologies, as described below. The estimated Total Enterprise Value does not purport to constitute an appraisal. The actual value of an operating business such as the Reorganized Debtor's business, is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business. More importantly, the future results of the Reorganized Debtor are dependent upon various factors, many of which are beyond the control or knowledge of the Debtor and, consequently, are inherently difficult to project. Thus, the Reorganized Debtor's actual future results may differ materially (positively or negatively) from the Debtor's five-year financial forecast relied upon by Valcor and, as a result, the actual enterprise value of the Reorganized Debtor may be higher or lower than the estimated. This is significantly important, because the Debtor has never met its financial projections in the past.

The estimated Total Enterprise Value does not constitute a recommendation to any holder of a Claim as to how such Entity should vote or otherwise act with respect to the Plan.

F.     **The Plan Commitment Letter**

As provided in the Plan Commitment Letter, Holdings agreed to advance $6 million to the Company under a plan of reorganization. The funding is sufficient to provide the Company with the liquidity it needs during the Reorganization Case and upon emergence.

Distributions under the Plan, are in conformance with the terms of the underlying contracts and agreements, including the Subordinated Unsecured Notes and the Senior Notes, and the Bankruptcy Code. Based on the Total Enterprise Value, as discussed above, of $16,500,000 estimated distributions to Creditors are set forth in the chart below.

Actual distributions on the Effective Date, however, will depend on the actual amounts owed to Creditors on the Effective Date, and the amount of funds that will have to be borrowed from Holdings as part of the DIP Loan and exit-financing. As a result, if the amount owed to Holdings under the DIP Loan is less than $3,151,000 (i.e. the Company borrows less money under the DIP) and the amount of Exit Financing, and the amounts owed to the DIP Factor and other secured creditors are the amounts estimated by the Company as provided below, the distributions to holders of Subordinated Unsecured Notes could be more than the 9% to 9.8% distribution that is currently estimated. However, if the amount owed to Holdings under the DIP Loan is more than what is estimated, the distributions to holders of Subordinated Unsecured Notes could very well be less. Actual distributions to holders of the Subordinated Unsecured Notes is going to be based upon the Company's financial performance during the Reorganization Case, the amount of funds it will have to borrow under the DIP, the cost of the bankruptcy process, and the actual amount of trade claims.

| Matrix of Value & Structure | | | |
| --- | --- | --- | --- |
| | | May 1 Emergence | |
| | 5/1/2011 | Amounts | Equity % |
| **Enterprise Value** | | 16,500,000 | |
| | | | |
| Estimated Secured Debt as of Exit | | | |
| Accord Factor | 2,025,018 | (2,025,018) | |
| Accord Term | 315,611 | (315,611) | |
| Other Secured Debt | | | |
| Van | 5,025 | (5,025) | |
| Forclift | 7,430 | (7,430) | |
| Total Debt | 2,353,084 | (2,353,084) | |
| | | | |
| Exit Financing Remaining as Debt | | (2,849,000) | |
| | | | |
| Net Equity Value | | 11,297,916 | |
| | | | |
| DIP Loan Converted to Equity | | (2,651,000) | 23.5% |
| | | | |
| Secured Pre-Petition Loan Converted to Equity | | (500,000) | 4.4% |
| | | | |
| 66 Month (PIK) Loan | | | |
| Principal as of 1/23/11 | 5,200,000 | (5,200,000) | 46.0% |
| Interest Thru 1/23/11 | 641,755 | (641,755) | 5.7% |
| Interest 1/24-4-30/11 | 184,768 | (184,768) | 1.6% |
| Additional Accrued Interest thru 4/30/11 | | | 0.0 |
| Total | 6,026,523 | (6,026,523) | 81.2% |
| | | | |
| Equity Value to Allocate to 8 Year Notes | | 2,120,393 | |
| | | | |
| 8 Year Notes | | | |
| Coffee Holdings | | | |
| Principal | 12,000,000 | | |
| Interest Thru 1/23/11 | 75,816 | | |
| Interest 1/24-4-30/11 | | | |
| Equity Allocation and Equity Percentage | 12,075,616 | 1,105,043 | 9.8% |
| | 52.1% | | |
| $10.5 Notes | | | |
| Principal | 10,500,000 | | |
| Interest Thru 1/23/11 | 595,479 | | |
| Interest 1/24-4-30/11 | | | |
| Equity Allocation and Equity Percentage | 11,095,479 | 1,015,350 | 9.0% |
| | 47.9% | | |
| | 23,171,096 | | |
| Total | | 11,297,916 | 100.0% |
| | | | |
| Summary of Ownership | | | |
| Coffee Holdings LLC | | 10,282,566 | 91.0% |
| $10.5 Million Converted | | 1,015,350 | 9.0% |
| Total | | 11,297,916 | 100.0% |

# ARTICLE III.

# EVENTS DURING THE BANKRUPTCY CASE

## A.     Commencement of the Bankruptcy Case

On January 24, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Reorganization Case has been assigned to the Honorable Brendan L. Shannon, United States Bankruptcy Judge.

**B. Motions, Applications and Other Pleadings Filed on or shortly after the Petition Date**

On or shortly after the Petition Date, the Debtor filed a number of motions, applications and other pleadings, including:

- Declaration Of Richard A Gartrell In Support Of The Debtor's Chapter 11 Petition And First Day Pleadings

- Debtor's Motion For Entry Of An Order Pursuant To 11 U.S.C. § 105(a), 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 And 2014 And Del. Bankr. L.R. 2002-1(f) Appointing Kurtzman Carson Consultants, Inc. As Claims, Noticing, And Balloting Agent to the Debtor and Debtor in Possession Nunc Pro Tunc to the Petition Date

- Motion of the Debtor for Entry of an Order Pursuant to Sections 105(a), 363 and 345 of the Bankruptcy Code and Local Rule 2015-2 Authorizing the Debtor to (I) Maintain and Use Its Existing Bank Accounts and Business Forms, (II) Maintain and Use Its Existing Cash Management System, and (III) Waive the Requirements of Section 345 of the Bankruptcy Code

- Motion for Entry of an Order Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing

- Debtor's Motion for Entry of an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment

- Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. Sections 105(a), 363(b), 363(c), 1107(a), and 1108 and Federal Rules of Bankruptcy Procedure, Rules 6003 and 6004 (I) Authorizing Debtor to (A) Honor and Perform Certain Prepetition Obligations to Customers, (B) Continue Customer Programs and (C) Honor Certain Other Prepetition Obligations Necessary to Maintain the Existence of Customer Programs; and (II) Granting Related Relief

- Debtor's Motion for Entry of Order Pursuant to 11 U.S.C. Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 and Federal Rules Bankruptcy Procedure, Rules 6003 and 6004 Authorizing the Debtor to (I) Honor Prepetition Obligations To and (II) Continue Prepetition Practices with Certain Critical Vendors

- Motion Of The Debtor For An Order (A) Authorizing The Debtor To Sell Accounts Receivable Under a Postpetition Accounts Receivable Factor Program And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507, Bankruptcy Rules 4001, 6003 And 6004, And Local Rule 4001-2 And (B) Scheduling A Final Hearing And Establishing Related Notice Requirements

- Debtor's Motion for Entry of Interim And Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rule 4001, and Local Rule 4001-2 (I) Authorizing And Approving Debtor-In-Possession Financing And The Use Of Cash Collateral, (II) Modifying The Automatic Stay Under Section 362 Of The Bankruptcy Code, And (III) Scheduling A Final Hearing And Approving Form And Manner Of Notice Thereof

- Motion of the Debtor for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals

### C.  Settlement with Javo Dispenser LLC

On January 21, 2011, the Company and Javo Dispenser, LLC[6] ("Dispenser") reached a settlement ("Settlement"), which was subject to this Court's approval, with respect to claims arising under the Master Equipment Lease Agreement ("Equipment Lease") between the parties. As of December 31, 2010, the Company owed Dispenser approximately $2 million, $954,975 of past due rent payments and $1,092,240 in future rental payments. Pursuant to the Settlement, the Company's obligation under the Equipment Lease is now limited to 31 payments totaling $400,000. Upon payment of the last payment in July 2013, the Company will own the approximate 828 liquid dispensers. On February 2, 2011, the Debtor filed a motion to approve the Settlement. An order was entered by this Court on [February 23, 2011] approving the Settlement. Accordingly, the Debtor has begun to make payments to Dispenser, as provided there under.

### D.  Retentions Applications

On February 4, 2011, the Debtor filed Applications Under 11 U.S.C. §§ 327(a) And 1107(b), Fed. R. Bankr. P. 2014 & 2016, And Bankr. D. Del. L.R. 2014-1 & 2016-1 To Approve The Employment And Retention Of Allen Matkins Leck Gamble Mallory & Natsis ("Allen Matkins") As General Bankruptcy Counsel, Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as co-Bankruptcy Counsel, and Valcor Consulting LLC ("Valcor") as its financial advisor, nunc pro tunc. Orders authorizing the retention of Allen Matkins, Morris Nichols and Valcor were entered by this Court on [February 23, 2011].

---

[6]  Two directors of the Company hold member interests in Dispenser aggregating less than 16%.

E.     **Schedules and Claims Bar Date**

On February __, 2011, the Debtor filed its Schedules, identifying its assets and liabilities. In addition, pursuant to an order dated [February 11, 2011] (the "Bar Date Order") this Court established the following Bar Dates for the filing of proofs of Claim in the Reorganization Case: (i) March 18, 2011 at 4:00 p.m. (prevailing Eastern Time) as the general Bar Date for all Claims, other than Claims of governmental units; and (ii) ____, at 4:00 p.m. (prevailing Eastern Time) as the Bar Date for the Claims of governmental units.

F.     **Cash Collateral, DIP Factor, and DIP Loan**

1.     *Accord Financial (DIP Factor)*

Pursuant to terms negotiated between the DIP Factor and the Debtor, the DIP Factor will continue to purchase receivables from the Company on the same terms and conditions as in the prepetition agreement. The DIP Factor continues to hold a first position security interest in and lien on all assets of the Debtor, except for the dispensers. An Interim Order approving the postpetition DIP Factor facility was entered by this Court on January 25, 2011. The Final Hearing is scheduled for February 11, 2011.

2.     *Holdings (DIP Lender)*

Pursuant to terms negotiated between the Debtor and Holdings (the "DIP Lender"), the DIP Lender agreed to provide postpetition financing (the "DIP Loan") to the Debtor to fund, to the extent necessary, postpetition operations and the administrative costs associated with this case in amount up to $3,150,000. Borrowings under the DIP Loan will accrue interest at LIBOR plus 8%, but not less than 9.5%. The DIP Loan will expire on the earlier of June 30, 2011, confirmation of the Plan, or conversion of the Reorganization Case to one under Chapter 7. The DIP Loan contemplates the roll-up of Holdings' prepetition Secured Promissory Note in the amount of $500,000. The DIP Lender will continue to hold a first position security interest in and lien on certain dispensers and any other unencumbered assets, and was granted a second position security interest in and lien on all assets of the Company. Under the DIP Loan, the Company agreed to meet certain case milestones, including that the hearing on confirmation of the Plan would occur within 90 days of the filing of the Plan. Under the Plan, on the Effective Date, the DIP Loan will not be repaid in Cash; rather balance of the DIP Loan as of the Effective Date will be converted into New Common Stock of the Reorganized Debtor. An Interim Order approving the DIP Loan was entered by this Court on January 25, 2011. The Final Hearing is scheduled for February 11, 2011.

**ARTICLE IV.**

**SUMMARY OF THE PLAN**

All Claims and Interests, except Administrative Claims, which include the DIP Factor Secured Claims and the DIP Facility Secured Claims, and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims, DIP Factor Secured Claims and DIP Facility Secured Claims) and Priority Tax Claims, as described below, have not been classified.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

1.  Unclassified Claims (not entitled to vote on the Plan)

     1.  *Administrative Claims*

     2.  *Professional Fee Claims*

     3.  *Priority Tax Claims*

     4.  *DIP Factor Secured Claims*

     5.  *DIP Facility Secured Claims*

2.  Unimpaired Classes of Claims (deemed to have accepted the Plan and not entitled to vote on the Plan)

     1.  *Class 1: Other Priority Claims*

     2.  *Class 4: Other Secured claims*

     3.  *Class 5: Convenience Class Claims*

3.  Impaired Classes of Claims (entitled to vote on the Plan)

     1.  *Class 3: Bunn-O- Matic Secured Claims*

     2.  *Class 6: General Unsecured Claims*

     3.  *Class 7: Senor Note Claims*

     4.  *Class 8: Subordinated Note Claims*

4.  Impaired Classes of Interests (deemed to have rejected the Plan and not entitled to vote on the Plan)

     1.  *Class 9: Old Preferred Stock ((impaired and deemed to have rejected the Plan and not entitled to vote)*

     2.  *Class 10: Old Common Stock ((impaired and deemed to have rejected the Plan and not entitled to vote)*

     3.  *Class 11: Old Warrants and Options (impaired and deemed to have rejected the Plan and not entitled to vote)*

# ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

**A.    Unclassified Claims**

*1.*    Administrative Claims

Liabilities incurred by the Debtor in the ordinary course of its business during the Reorganization Case will be paid in the ordinary course of business, and in accordance with any terms and conditions of any agreements relating thereto.

With respect to other Administrative Claims, if any, unless otherwise agreed to by the Debtor, Holdings, and the Entity claiming an Allowed Administrative Claim, each holder of an Allowed Administrative Claim (other than a Professional Fee Claim, the DIP Factor Secured Claim, and the DIP Facility Secured Claims) will receive, in full satisfaction and settlement of and in exchange for their Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim on the later of (i) the Effective Date, and (ii) the date on which such Claim becomes an Allowed Administrative Claim.

*2.    Professional Fee Claims*

A portion of the Professional Fee Claims will be paid during the course of the Reorganization Case as provided under the Order Establishing Procedures for Establishing Interim Compensation and Reimbursement of Expenses of Professionals (D.I. --) and the budget approved as part of the DIP Facility.    The balance of the Professional Fees will be treated in accordance with section 11 hereof.

*3.*    Tax Claims

Unless otherwise agreed to by the Debtor, Holdings, and the holder of an Allowed Tax Claim, each holder of a Allowed Tax Claim will receive cash equal to the unpaid portion of such Allowed Tax Claim on or as soon as practical after the later of (i) the Effective Date, and (ii) the date on which such Tax Claim becomes an Allowed Tax Claim; provided, however, that at the option of Reorganized Debtor, it may pay Allowed Tax Claims over a period not exceeding five (5) years after the date of assessment of the Allowed Tax Claim as provided in Section 1129(a)(9)(C) of the Bankruptcy Code.    If the Reorganized Debtor elects this option as to any Allowed Tax Claim, then the payment of such Allowed Tax Claim will be made in equal semiannual installments with the first installment due on the latest of: (i) the Effective Date, (ii) 30 calendar days after the date on which an order allowing such Allowed Tax Claim becomes a Final Order, and (iii) such other time as may be agreed to by the holder of such Allowed Tax Claim and the Reorganized Debtor.    Each installment will include simple interest on the unpaid portion of such Allowed Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable nonbankruptcy law; provided, however, that the Reorganized Debtor will reserve the right to pay any Allowed Tax Claim, or any remaining balance of such Allowed Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty.    At present, the Debtor is aware of only the Claim of the County of San Diego for unpaid personal property taxes that would be part of this class.

*4.*     DIP Factor Secured Claims.

Currently the Debtor, Holdings and the DIP Factor are negotiating the terms by which the DIP Factor Secured Claims will be satisfied.

*5.*     DIP Facility Secured Claims.

Holdings is the holder of the DIP Facility Secured Claims. In complete settlement, satisfaction and discharge of its Claim, Holdings will receive New Common Stock of the Reorganized Debtor in an amount equal to 100% of its Claim. Assuming that the entire amount of the DIP Loan ($3,150,000) is advanced during the Reorganization Case and is outstanding on the Effective Date, the Debtor estimates, based on a Total Enterprise Value of $16,500,000, that Holdings will receive 27.9% of the New Common Stock.

**B.     Unimpaired Claims**

*1.*     Class 1: Other Priority Claims

Unless otherwise agreed to the Debtor and the Entity holding an Allowed Other Priority Claim, each holder of an Allowed Claim in Class 1 will be paid the allowed amount of such Claim in full in Cash on the later of (a) the Effective Date, and (b) the date such Claim becomes an Allowed Claim.

*2.*     Class 4: Other Secured Claims

This Class is comprised of two holders of equipment loans aggregating approximately $12,500 as of the Petition Date. On the later of (a) the Effective Date, and (b) the date such Claim becomes an Allowed Claim, in the sole discretion of the Reorganized Debtor, the holder of an Allowed Class 4 Other Secured Claim will receive (i) reinstatement and unimpairment of its Allowed Class 4 Other Secured Claim or (ii) in full and complete satisfaction of its Allowed Class 4 Other Secured Claim (a) cash in the full amount of such claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the collateral securing such claims to the extent of the value of the holder's secured interest in such collateral or (c) the collateral securing such claims and any interest on such claim required to be paid pursuant to section 506(b) of the Bankruptcy Code. The Debtor will continue to make payments to such holders in accordance with the terms of their respective agreements during the Reorganization Case and contemplates that such Claims will be reinstated on the Effective Date.

*3.*     Class 5: Convenience Class Claims

Convenience Class Claims include holders of Claims in Allowed amounts less than $5,000. Allowed On the later of (a) the Effective Date, and (b) the date such Claim becomes an Allowed Claim, each holder of an Allowed Convenience Class Claim, in complete settlement, satisfaction and discharge of its Class 5 Claim, will receive a Cash payment in the full amount of such holder's Allowed Claim. The Debtor estimates that the aggregate amount of Convenience Class Claims is approximately $168,000.

### C.    Impaired Claims

1.    Class 2:  Prepetition Factor Secured Claims

Currently the Debtor, Holdings and the DIP Factor are negotiating the terms by which the Prepetition Factor Secured Claims, if any at the time of the Effective Date, will be satisfied.

2.    Class 3:  Bunn-O-Matic Secured Claims

The holder of the Allowed Class 3 Claims holds a purchase money security interest in certain dispensers.  In complete settlement, satisfaction and discharge of its Allowed Class 3 Claim, Bunn-O-Matic will receive: (i) a payment as soon as practicable after the Effective Date in an amount equal $379,140.20 (the sum of the pre-petition accrued and unpaid interest of $107,706.81 plus 25% of the principal balance $271,433.39); (ii) a promissory note in the amount of $814,300.18, payable in three equal installments every two months commencing on the last day of the second month following the Effective Date until paid (iii) interest from and after the Effective Date on the unpaid principal amount of promissory note based on a 365 day year and actual days elapsed at a rate of eight percent (8%) per annum payable in arrears in cash commencing on the last day of the second month following the Effective Date; and (iv) a continued security interest in and lien on the collateral identified in the Bunn Purchase Agreement until the promissory note is paid in full.

3.    Class 6:  General Unsecured Claims

On the later of (a) the Effective Date, and (b) the date such Claim becomes an Allowed Claim, each holder of an Allowed Claim in Class 6, in complete settlement, satisfaction and discharge of its Class 6 Claim, will receive a Promissory Note in the amount of their respective Allowed Claim on the Effective Date.  The Promissory Notes will be due twelve months following the Effective Date, bearing interest at 8% per annum, payable in two semi-annual payments of interest and principal, with no penalty or premium, if paid prior to maturity.  The aggregate amount of General Unsecured Claims as of the Petition Date was approximately $2.25 million, excluding Convenience Class Claims in Class 5.  During the course of the Reorganization Case, some of this amount will be paid in accordance with the Orders Approving Critical Vendor Payments (D.I. __) and Customer Programs (D.I. __), and cured in connection with the assumption of Executory Contracts and Unexpired Leases.

4.    Class 7:  Senior Notes Claims

Senior Note Claims are held by Holdings in the aggregate amount of $5,841,755, including accrued and unpaid interest, as of the Petition Date.  On the Effective Date, Holdings, in complete settlement, satisfaction and discharge of its Senior Note Claims, will receive New Common Stock of the Reorganized Debtor in an amount equal to 100% of its Claim (which includes accrued interest during the Reorganization Case).  As set forth in the chart in section 2.F hereof, the Debtor estimates, based on a Total Enterprise Value of $16,500,000, that Holdings will receive 53.3% of the New Common Stock on account of its Senior Note Claims.

5. Class 8: Subordinated Notes Claims

The Subordinated Notes Claims are held by Holdings and 46 other Investors. The aggregate amount of Subordinated Notes Claims, including accrued and unpaid interest, as of the Petition Date is $23,171,095. On the Effective Date, each holder of a Subordinated Unsecured Note, in complete settlement, satisfaction and discharge of its Claim, will receive its pro rata share of the remaining New Common Stock of the Reorganized Debtor after distribution to Holdings as the holder of the DIP Facility Claims and the Senior Note Claims. The Debtor estimates that Holders of Subordinated Notes Claims will receive 18.8% of the New Common Stock, of which 9.8% would go to Holdings on account of their ownership of $12,000,000 of the Subordinated Unsecured Notes, and 9% would got to Investors on account of their ownership of $10,500,000 of the Subordinated Unsecured Notes.

In lieu of receipt of New Common Stock, each Investor holding an Allowed Subordinated Notes Claim will be entitled to elect to receive the Note Cash Payment to be paid as soon as is practicable after the Effective Date. The Note Cash Payment will be in an amount equal to the value of the New Common Stock that would otherwise would have been distributed to the Investor less a discount rate determined by Holdings at the time the order approving the Disclosure Statement is entered. Investors have to make the election on the Ballot and have it returned by the Voting Deadline. In the event a holder of Allowed Class 10 Claim elects to receive a Note Cash Payment, the New Common Stock that would otherwise would have been received by the Investor will be distributed to Holdings.

**D. Interests**

1. Class 9: Old Preferred Stock

Since there is insufficient Total Enterprise Value, on the Effective Date, all Old Preferred Stock will be automatically cancelled and extinguished and each holder will not be entitled to, and will not receive or retain any property or interest in property on account of their Interests.

2. Class 10: Old Common Stock

Since there is insufficient Total Enterprise Value, on the Effective Date, all Old Common Stock will be automatically cancelled and extinguished and each holder will not be entitled to, and will not receive or retain any property or interest in property on account of their Interests.

3. Class 11: Old Warrants and Options

Since there is insufficient Total Enterprise Value, on the Effective Date, all Old Warrants and Options, including any rights under certain Restricted Stock Award Agreement, whether or not vested, will be automatically cancelled and extinguished and each holder thereof will not be entitled to, and will not receive or retain any property or interest in property on account of their Interests.

### E. Allowed Claims; Deemed Allowed Claims

Notwithstanding any provision herein to the contrary, the Reorganized Debtor will only make distributions to holders of Allowed Claims. No holder of a Disputed Claim will receive any distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. The Reorganized Debtor may, in its discretion, withhold distributions otherwise due hereunder to any Claimholder until such time as objections thereto may be filed. Any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution in accordance with the terms and provisions of the Plan.

### F. Retention of Causes of Action/Reservation of Rights

Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtor or the Reorganized Debtor may have currently or which the Reorganized Debtor may choose to assert on behalf of its Estate under any provision of the Bankruptcy Code or any similar applicable non-bankruptcy law, including, without limitation, (i) the avoidance of any transfer by or obligation of the Company or the Debtor or (ii) the turnover of any property to the Estate, all of which are expressly reserved by the Plan.

Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtor had immediately prior to the Petition Date, against or with respect to any Claim left unaltered or Unimpaired by the Plan. The Reorganized Debtor will retain, reserve and be entitled to assert all such claims, causes of action, rights of setoff and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 case had not been commenced; and the Reorganized Debtor's legal and equitable rights respecting any Claim left unaltered or Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 case had not been commenced.

### G. Setoffs

The Reorganized Debtor may, but will not be required to, setoff against any Claim (for purposes of determining the allowed amount of such Claim on which distribution will be made), any claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim the Debtor may have against such claimant.

### H. Objections to Claims

The Debtor and the Reorganized Debtor may object to the allowance of any Claim filed in the Reorganization Case. All objections will be litigated to a Final Order; provided, however, that the Debtor or the Reorganized Debtor, as the case may be, may compromise and settle any objections to Claims, without approval of the Court, and may seek Court estimation of Contested Claims pursuant to Section 502(c) of the Bankruptcy Code.

# ARTICLE VI.

## ACCEPTANCE OR REJECTION OF THE PLAN

### A.     Impaired Classes of Claims Entitled to Vote

Holders of Claims in each Impaired Class of Claims as of the Petition Date are entitled to vote as a Class to accept or reject the Plan.

### B.     Acceptance by Impaired Classes of Claims

An Impaired Class of Claims will have accepted the Plan if (i) the holders (other than those designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than those designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### C.     Presumed Acceptance of Plan

The Claims in Classes 1, 4, and 5 are Unimpaired under the Plan and the holders of such Claims are conclusively presumed to have accepted the Plan.

### D.     Deemed Non-Acceptance of Plan

Holders of Interests in Classes 9, 10, and 11 are deemed to have rejected the Plan and will not be solicited for acceptances or rejections of the Plan.

### E.     Voting Classes

The Claims in Classes 2, 3, 6, 7, and 8 are Impaired; consequently, the holders of Claims in such Classes are entitled to vote to accept or reject the Plan in accordance with the terms of the Plan and the Disclosure Statement Approval Order.

### F.     Non-Consensual Confirmation

The Debtor will seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in view of the deemed non-acceptance by Classes 9, 10, and 11. In the event that any other Impaired Class of Claims does not accept the Plan in accordance with Section 1126 of the Bankruptcy Code, the Debtor hereby requests that the Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code. Subject to Section 1127 of the Bankruptcy Code, the Debtor, with the consent of Holdings, reserves the right to modify the Plan to the extent that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE VII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A. Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor**

The Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, with all powers of a corporation under the laws of the state of Delaware and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law. Except as otherwise expressly provided in the Plan, and subject to the liens granted to secure the Exit Financing, on the Effective Date, the Reorganized Debtor will be vested with all of the property of its Estate free and clear of all claims, liens, encumbrances, charges and other interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the Court, including, without limitation, any contracts or leases entered into or assumed by the Debtor after the Petition Date; provided, however, that the Reorganized Debtor will continue as a debtor in possession under the Bankruptcy Code until the Effective Date, and, thereafter, the Reorganized Debtor may operate its business, sell its assets, and incur liabilities free of any restrictions imposed by the Bankruptcy Code or the Court.

**B. Plan Implementation Steps**

On or as soon as practicable after the Effective Date (unless otherwise expressly indicated), the following actions will be effectuated:

(a) **Amended and Restated Certificate of Incorporation**. The Reorganized Debtor will file its Amended and Restated Certificate of Incorporation with the offices of the Secretary of State of Delaware. The Amended and Restated Certificate of Incorporation will, among other things, provide for the prohibition of the issuance of non-voting equity securities to the extent required by Section 1123(a) of the Bankruptcy Code and applicable case law. After the Effective Date, the Reorganized Debtor may amend and restate its Amended Certificate of Incorporation and other constituent documents as permitted by applicable state law.

(b) **Amended and Restated Bylaws**. The Reorganized Debtor will adopt and effect its Amended and Restated Bylaws.

(c) **D&O Insurance**. Reorganized Debtor will purchase or take such other actions that are necessary to renew, confirm or continue, as the case may be, director and officer tail insurance coverage in the same amount as the existing director and officer insurance policies in place as of the Petition Date for a term of not less than six years following the Effective Date.

(d) **Privatizing Reorganized Debtor**. Reorganized Debtor will take the steps necessary to convert to and maintain itself as a privately held, non-reporting company, including but not limited to, filing the appropriate forms with the SEC and applicable stock exchanges and otherwise to ensure Reorganized Debtor will not be a reporting company under the Exchange Act.

(e)     **Management Incentive Plan**. Reorganized Debtor will adopt and implement the Management Incentive Plan.

(f)     **Professional Service Contract**.     Reorganized Debtor will enter into a Professional Services Agreement with Holdings.

## C.     Exit Financing

On the Effective Date, Holdings, or its nominee, will provide the Reorganized Debtor with Exit Financing in an amount not to exceed $2.86 million to provide (i) post-emergence working capital of at least $500,000, and (ii) funds sufficient to pay all Administrative and Priority Expenses and other obligations under the Plan that are payable on the Effective Date.

## D.     Debt and Equity After Emergence

On the Effective Date, Reorganized Debtor (i) will issue the New Senior Exit Facility Notes, the Promissory Notes, and the New Common Stock, and (ii) will execute and deliver the New Senior Exit Facility Agreement and the Shareholders Agreement.

## E.     Cancellation of Securities and Agreements

On the Effective Date, subject to the terms of the Plan, the DIP Factor Agreement, Prepetition Factor Agreement, the Prepetition Factor Term Loan, the DIP Lender Note, the Senior Unsecured Notes, the Subordinated Unsecured Notes, Old Preferred Stock, Old Common Stock, and Old Warrants and Options, and all documentation related thereto will be deemed automatically canceled and surrendered, will be of no further force, whether actually surrendered for cancellation or otherwise, and the obligations of the Debtor and the Reorganized Debtor, if any, thereunder or in any way related thereto will be released and discharged.

## F.     Directors

Upon the Effective Date, the operation of the Reorganized Debtor will become the general responsibility of the board of directors who will, thereafter, have the responsibility for the management, control and operation of the Reorganized Debtor. The Amended and Restated Bylaws will govern the size and composition of the Board of Directors, and Holdings will nominate and appoint all directors. The names of each of the director nominees will be disclosed and made a part of the Plan Supplement. All directors will be deemed elected, and those directors not continuing in office will be deemed removed from the board effective on the Effective Date, pursuant to the Confirmation Order. The directors' tenure and the manner of selection of new directors will be initially as provided in the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.

## G.     Officers

The initial officers of the Reorganized Debtor will be disclosed as part of the Plan Supplement. After the Effective Date, the officers will serve until such time as they may resign, be removed or be replaced by the board of directors of the Reorganized Debtor.

### H.    Employment Contracts

From and after the Effective Date, the Reorganized Debtor may enter into employment contracts with their respective officers, agents or employees.  All new employment contracts entered into will be disclosed as required by the Bankruptcy Code in connection with Confirmation of the Plan.

### I.    Section 1145

(a)    Confirmation of the Plan will constitute a determination, in accordance with Section 1145 of the Bankruptcy Code, that (except with respect to an entity that is an underwriter as defined in Bankruptcy Code section 1145(b), as set forth below) Section 5 of the 1933 Act and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, broker or dealer in, a security do not apply to the offer, sale, or issuance of any securities under the Plan (including the shares of New Common Stock).

(b)    Certificates evidencing shares of New Common Stock that are received by holders of 10 percent or more of the outstanding New Common Stock calculated on a fully diluted basis or by holders that are otherwise underwriters as defined in Bankruptcy Code section 1145(b) with respect to the securities will bear an appropriate  legend restricting their transferability as set forth in the Plan.   The only party this affects is Holdings.

### J.    The Shareholders Agreement

All persons receiving New Common Stock or any other option to acquire New Common Stock (including persons granted options pursuant to the Management Incentive Plan) will be deemed to be parties to the Shareholders Agreement, whether or not such persons actually execute a counterpart to the Shareholders Agreement, and all New Common Stock, and any other option to acquire New Common Stock will be subject to the Shareholders Agreement.   The Shareholders Agreement will be in form and substance acceptable to Holdings.

### K.    Effectuating Documents; Further Transactions

The Debtor and the Reorganized Debtor, subject to the terms and conditions of the Plan, will be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions

Except as otherwise provided in the Plan, property to be distributed under the Plan to an Impaired Class (i) will be distributed on or as soon as practicable after the Effective Date to each holder of an Allowed Claim who holds an Allowed Claim as of the Effective Date, and (ii) will be distributed to each holder of an Allowed Claim of that Class that is allowed after the Effective

Date, to the extent allowed, as soon as practicable after the order of the Court allowing the Claim becomes a Final Order. Common Stock distributed in respect of the Subordinated Unsecured Notes will be deemed to have been distributed, first, in exchange for the outstanding principal amount of the Subordinated Unsecured Notes and, second, in exchange for accrued and unpaid interest, fees, costs and charges. Property to be distributed under the Plan to a Class that is not Impaired or on account of an Administrative Claim will be distributed on the latest of (i) the distribution dates specified in the preceding sentence, or (ii) the date on which the distribution to the holder of the Claim would have been due and payable in the ordinary course of business or under the terms of the Claim in the absence of the Reorganization Case.

### B. Distribution Record Date

The transfer registers for the Old Preferred Stock and Old Common Stock as maintained by the Debtor or its agents, will be closed the Business Day immediately preceding the Effective Date. Neither the Debtor, the Reorganized Debtor, nor the Exchange Agent will have any obligation to recognize any transfer of the Old Preferred Stock or Old Common Stock occurring after this date.

### C. Exchange Agent

The Reorganized Debtor will distribute all the property to be distributed under the Plan, including, without limitation, the delivery of Cash, the New Senior Exit Facility Notes, the Promissory Notes, and the New Common Stock.

### D. Unclaimed Distributions

If any holder of a Claim entitled to a distribution under the Plan cannot be located on the Effective Date, the distribution will be set aside and maintained by the Reorganized Debtor. If such person is located within one year of the Effective Date, such distribution will be distributed to such person. If such person cannot be located within one year of the Effective Date, any such distribution will become the property of and will be released to Reorganized Debtor, provided, however, that nothing contained in this Plan will require the Reorganized Debtor to attempt to locate such person.

### E. Prepayments

Except as otherwise provided in this Plan or in the Confirmation Order, the Reorganized Debtor will have the right to prepay, without penalty, all or any portion of any Allowed Claim at any time, plus any accrued and unpaid interest, if applicable.

### F. Cash Payments

Cash payments made pursuant to this Plan will be in U.S. dollars and will be made at the option and in the sole discretion of Reorganized Debtor by (i) checks drawn on, or (ii) wire transfers from a domestic bank.

### G.    Withholding and Reporting Requirements

1.    **Tax Reporting**.  In accordance with Section 346 of the Bankruptcy Code and in connection with the Plan and all distributions thereunder, the Debtor and the Reorganized Debtor will, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority.  The Debtor and the Reorganized Debtor will be authorized to take any and all actions necessary and appropriate to comply with such requirements.  All distributions hereunder will be subject to applicable legal withholding and reporting requirements.  As a condition of making any distribution under the Plan, the Reorganized Debtor may require the holder of an Allowed Claim to provide such holder's taxpayer identification number, and such other information, certification or forms as necessary to comply with applicable tax reporting and withholding laws.  Notwithstanding any other provision of this Plan, each Entity or governmental authority receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such distribution.

2.    **Tax Provisions**.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments of real or personal property executed in connection with any of the transactions contemplated under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.  In addition, each of the relevant state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE IX.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, and to the extent permitted by applicable law all executory contracts and unexpired leases of the Debtor will be assumed in accordance with the provisions of Section 365 and Section 1123 of the Bankruptcy Code, excluding (a) any and all Executory Contracts or Unexpired Leases which are the subject of separate motions for approval to reject filed pursuant to Section 365 of the Bankruptcy Code by the Debtor prior to the commencement of the hearing on confirmation of the Plan, (b) such contracts or leases as are listed on any "Schedule of Rejected Executory Contracts and Unexpired Leases" filed by the Debtor on or before occurrence of the Confirmation Date (provided the Debtor will retain the right to modify such schedule on or before the Effective Date), all of which contracts or leases will be deemed rejected pursuant to the provisions of Section 365 and Section 1123 of the Bankruptcy Code, and (c) any and all Executory Contracts or Unexpired Leases rejected prior to entry of the

Confirmation Order. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtor in the ordinary course of its business.

### B.    Insurance Policies

All of the Debtor's insurance policies including, without limitation, insurance policies for the Debtor's directors and officers, and any agreements, documents or instruments relating thereto, are treated as Executory Contracts under the Plan. Nothing contained in this section will constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity, including, without limitation, the insurer under any of the Debtor's policies of insurance.

### C.    Cure Amounts

No later than the date specified in the Disclosure Statement Approval Order, the Debtor will file an Assumed Contracts Schedule containing a list of the Assumed Executory Contracts and the associated Cure Amounts. The non-Debtor parties to the Assumed Executory Contracts will have until the Contract Objection Deadline to object to (i) the Cure Amounts listed by the Debtor and propose alternative Cure Amounts, and/or (ii) the proposed assumption of the Assumed Executory Contracts. Any Contract Objection must be filed with the Court on or before the Contract Objection Deadline and will be heard and determined by the Court. Any such Contract Objection not filed by the Contract Objection Deadline will be waived and forever barred.

### D.    Deemed Assumption Subject to Revocation

To the extent the Court has not determined by the Effective Date the amount of any Cure Amount that is subject to a pending objection, the Executory Contract or Unexpired Lease related to such Cure Amount will, at the option of the Reorganized Debtor, be deemed assumed by the Reorganized Debtor effective on the Effective Date; provided, however, the Reorganized Debtor may revoke an assumption of any Executory Contract or Unexpired Lease within ten (10) days after entry of an order by the Court adjudicating the objection to the Cure Amount related to such Executory Contract and Unexpired Lease by filing a notice of such revocation with the Court and serving a copy on the party(ies) whose Executory Contract or Unexpired Lease is rejected. Any Executory Contract or Unexpired Lease identified in such revocation notice will be deemed rejected retroactively on the Effective Date. Any party whose Executory Contract is rejected pursuant to a revocation notice may file a claim arising out of such rejection within thirty (30) days after such revocation notice is filed with the Court, and any such rejection claim not filed by that deadline will be discharged and forever barred. The Reorganized Debtor will have the right to object to any such rejection claim.

### E.    Payment of Cure Amounts

Within twenty (20) Business Days after the Effective Date, Reorganized Debtor will pay all Cure Amounts that are not disputed by the Debtor or Reorganized Debtor. Unless otherwise ordered by the Court, the Reorganized Debtor will pay all Cure Amounts that are disputed by the Debtor or Reorganized Debtor on the later of the date that is twenty (20) Business Days after (i) the Contract Objection Deadline, or (ii) the date of entry of a Final Order resolving the dispute or approving an agreement between the parties concerning the Cure Amount.

### F. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Any Claims arising out of the rejection of contracts or leases must be filed with the Court by the Rejection Bar Date. Any Claims not filed within such time will be forever barred from assertion against the Debtor or Reorganized Debtor, its estate and property. Unless otherwise provided in this Plan, all such Claims for which proofs of Claim are required to be filed will be treated as Class 8 Claims.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A. Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date, unless otherwise waived:

1.    the Plan satisfies each of the requirement of Section 1129 of the Bankruptcy Code, as applicable;

2.    the proposed Confirmation Order and the Plan will be in all respects acceptable to the Debtor and Holdings; and

3.    the Confirmation Order will be entered no later than ninety days (90) following the filing of the Plan.

### B. Conditions to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, unless otherwise waived:

1.    the Confirmation Order will contain the provisions set forth in Section 8.1 of the Plan and the Confirmation Order will have become a Final Order;

2.    the Reorganized Debtor will have received Exit Financing Advance sufficient to pay in full the Claims required to be paid in Cash on the Effective Date and to provide the Reorganized Debtor with not less than $500,000 in working capital after Effective Date payments have been made;

3.    Holdings will have provided the Reorganized Debtor the funds sufficient to satisfy the aggregate Note Cash Payments to Investors that elected to receive such payments in lieu of New Common Stock;

4.    the effectiveness of the Confirmation Order will not have been stayed and any motion for reconsideration or rehearing will have been denied or overruled by a Court of competent jurisdiction;

5.    the Reorganized Debtor will have purchased, renewed, confirmed or continued, as the case may be, the director and officer tail insurance coverage relating to director and officer insurance policies that were in place on the Petition Date for a term of not less than six years following the Effective Date;

6.    the Reorganized Debtor will not be a reporting company under the Exchange Act;

7.    all actions, documents, and agreements necessary to implement the Plan will have been effected or executed;

8.    Holdings will have received all accrued fees, costs, charges and expenses (including the fees and expenses of Dechert LLP) incurred in connection with the restructuring of the Debtor; and

9.    the Shareholders Agreement and the Professional Service Agreement will be executed and in form and substance acceptable to Holdings.

### C.    Waiver of Conditions

The Debtor, with the consent of Holdings, may waive any condition set forth in A and B above at any time, without notice, without leave of or order of the Court, and without any formal action other than proceeding to consummate the Plan.

# ARTICLE XI.

# ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

### A.    Professional Fee Claims

#### 1.    *Final Fee Applications for Professionals*

All applications for final compensation of professional persons (including counsel for the Debtors and the Committee but excluding counsel for Holdings) for services rendered and reimbursement of expenses incurred on or before the Effective Date must be Filed no later than 45 days after the Effective Date. Substantial contribution requests, if any, under Section 503(b) of the Bankruptcy Code will also be Filed no later than 45 days after the Effective Date. Objections, if any, to final fee applications and such requests must be Filed and served on Reorganized Debtor, the requesting professional and the Office of the United States Trustee no later than twenty days from the date on which each such final fee application is served and Filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the allowed amounts of such professional's Administrative Claims will be determined by the Court. The Reorganized Debtor will be responsible for payment of any final fee applications approved by the Court after application of any retainers being held by any such professional person.

2. *Other Administrative Claims*

All requests for payment of administrative costs and expenses incurred on or before the Effective Date under Section 507(a)(1) or 507(b) of the Bankruptcy Code or the terms hereof (except only for Post-petition Trade Claims incurred in the ordinary course of business and claims under 28 U.S.C. § 1930) will be filed no later than 45 days after the Effective Date.

3. *Effect of Failure to Timely File Claim or Request for Payment*

Any request for payment of an Administrative Claim which is not filed by the applicable deadline set forth above will be barred. Under no circumstance will the applicable deadlines set forth above be extended by order of the Court or otherwise. Any holder of an Administrative Claim who is required to file a claim or request for payment of such Claim or expenses and who does not file such claim or request by the applicable bar date will be forever barred from asserting such Claim or expense against the Debtor, the Reorganized Debtor, any property of the Debtor or the Reorganized Debtor, or any distributions under the Plan.

4. *Employment of Professionals after the Effective Date*

From and after the Effective Date, any requirement that professionals comply with Bankruptcy Code sections 327 through 331 or any order previously entered by the Court in seeking retention or compensation for services rendered or expenses incurred after such date will terminate.

# ARTICLE XII.

# EFFECTS OF CONFIRMATION

A. **Binding Effect**

The Plan will be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all present and former holders of Claims and Interests, whether or not such holders will receive or retain any property or interest in property under the Plan, and their respective successors and assigns.

B. **Discharge of All Claims and Interest**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights and treatment provided in the Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and Interests of any nature whatsoever against the Debtor and any of the Estate's property, whether such Claims or Interests arose before or during the Bankruptcy Case or in connection with implementation of the Plan, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtor or its assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims and Interests,

including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not: (i) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Interest has accepted the Plan. Any default by the Debtor with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Reorganization Case will be deemed cured on the Effective Date. Pursuant to Bankruptcy Code section 524, the discharge granted under this section will void any judgment against the Debtor at any time obtained (to the extent it relates to a discharged Claim or Interest), and operate as an injunction against the prosecution of any action against the Reorganized Debtor or the Estate's property (to the extent it relates to a discharged Claim or Interest). The Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### C. Term of Bankruptcy Stay and Injunctions

All injunctions or stays provided for in the Bankruptcy Case under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date. Upon the Effective Date, the injunctions provided in Article IX will apply.

### D. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it.

### E. Satisfaction of Subordination Rights

All Claims against the Debtor and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtor, based upon any subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Plan to holders of Claims or Interests having such subordination rights, and such subordination rights will be deemed waived, released, discharged, and terminated as of the Effective Date. Distributions to

the various Classes of Claims hereunder will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim or Interest by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

F. **Debtor Release**

*Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor, and the estate from (and the Debtor shall be permanently enjoined from bringing) any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or the estate would have been legally entitled to assert in its own right or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Reorganization Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Reorganization Case, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.*

G. **Release by Holders of Claims**

*Except as otherwise provided in the Plan, for good and valuable consideration, on and after the Effective Date, each holder of a Claim related to or against the Debtor (whether or not Allowed), and each Person or Entity participating in exchanges and distributions under or pursuant to the Plan, for itself and its respective successors, assigns, transferees, current and former officers, directors, agents and employees, in each case in their capacity as such shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtor and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's recapitalization, the Reorganization Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the*

*restructuring of Claims and Interests prior to or in the Reorganization Case, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor or a Released Party that constitutes willful misconduct or gross negligence; provided that the release pursuant to this section shall not apply to the holder of a Claim who opts out of this release pursuant to the terms set forth in the Ballots and the Disclosure Statement Approval Order.*

*Notwithstanding anything to the contrary in the foregoing paragraph, the intended releases do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.*

### H. Exculpation

*Except as otherwise specifically provided in this Plan, the Debtor, the Reorganized Debtor and the Released Parties will not have or incur any claim, obligation, cause of action or liability to one another or to or from any holders of Claims or Interests, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, negotiation and filing of the Plan, filing the Bankruptcy Case, the pursuit of Confirmation of the Plan, the Plan Sponsorship Agreement, the consummation of the Plan and the execution of all documents and issuance of all securities thereunder, the administration of the Plan or the property to be liquidated and/or distributed under the Plan, except for their willful misconduct, gross negligence, or fraud as determined by a Final Order of a court of competent jurisdiction, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

### I. Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or continued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests in or against the Debtor are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or estate on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to

section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

# ARTICLE XIII.

## RETENTION OF JURISDICTION

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the Effective Date having occurred, the Court will retain exclusive jurisdiction to the fullest extent permitted by law for the purposes of resolving all disputes and other issues presented or arising under this Plan including, without limitation, to (a) determine any Contested Claims, (b) determine requests for payment of Claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto, (c) resolve controversies and disputes regarding interpretation and implementation of the Plan, (d) enter orders in aid of the Plan, including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect the Debtor and the Reorganized Debtor, (e) modify the Plan pursuant to Section 14.1 of the Plan, (f) determine any and all applications, adversary proceedings and contested or litigated matters pending on the Effective Date, (g) allow, disallow, estimate, liquidate or determine any Claim and enter or enforce any order requiring the filing of any such Claim before a particular date, provided that, the Court's jurisdiction will be concurrent, not exclusive, after the Effective Date with respect to the enforcement and adjudication of Claims that are Unimpaired, (h) determine any and all pending applications for the rejection or disaffirmance of executory contracts or leases, or for the assignment of assumed executory contracts and leases, and hear and determine, and if need be to liquidate, any and all Claims arising therefrom, (i) determine any actions or controversies arising under or in connection with the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement created in connection with the Plan or the Disclosure Statement and enforce any orders related thereto, (j) enter and implement orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, and (k) enter a final decree closing the Reorganization Case.

### B.    Failure of Court to Exercise Jurisdiction

If the Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Reorganization Case, including the matters set forth in this Article XII, this Article will not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### C.    Dissolution of Creditors' Committee

The appointment of the Creditors' Committee will terminate on the Effective Date. The Creditors' Committee may appear at the hearing to consider applications for final allowances of Professional Fee Claims.

## ARTICLE XIV.

## MISCELLANEOUS PLAN PROVISIONS

A.     **Modification of Plan**

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Reorganized Debtor may, upon order of the Court, amend or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.     **Debtor Withdrawal of Plan**

The Debtor reserves the right, at any time prior to the entry of the Confirmation Order, to revoke and withdraw the Plan. If the Debtor revokes or withdraws the Plan under this Section, or if entry of the Confirmation Order does not occur, then the Plan will be deemed null and void. In that event, nothing contained in the Plan will be deemed to constitute a waiver or release of any Claims by or against or any Interests in the Debtor or to prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

C.     **Holdings Withdrawal of Plan**

Upon written notice to the Debtor, Holdings may demand the Debtor to withdraw the Plan and Disclosure Statement and, in lieu of the Plan, seek to effectuate a restructuring of the Debtor's liabilities pursuant to a sale process under section 363 of the Bankruptcy Code. Upon receipt of such written notice by Holdings to the Debtor, the Debtor will promptly withdraw the Plan.

D.     **Effect of Withdrawal or Modification of Plan**

In the event the Plan is withdrawn or modified without the consent of Holdings, the DIP Facility Secured Claims will be paid in full in accordance with the terms of the DIP Lender Note; rather than the treatment provided in 2.5 herein.

E.     **Successors and Assigns**

The rights, benefits and obligations of any person or entity named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, successor or assign of such person.

F.     **Payment of Statutory Fees**

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, to the extent required to be paid, will be paid until the Reorganized Case is closed.

### G. Notices

Any notice, request or demand given or made under this Plan or under the Bankruptcy Code or the Bankruptcy Rules will be in writing and will be hand delivered or sent by a reputable overnight courier service, and will be deemed given when received at the following addresses whether hand delivered or sent by overnight courier service:

If to the Debtor:

> Richard A. Gartrell
> Javo Beverage Company, Inc.
> 1311 Specialty Drive
> Vista, CA 92081

with a copy to:

> Debra A. Riley
> Allen Matkins Leck Gamble Mallory & Natsis LLP
> 501 West Broadway, 15th Floor
> San Diego, CA 92101

> And

> Robert J. Dehney
> Matthew B. Harvey
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 18th Floor
> P.O. Box 1347
> Wilmington, DE 19899-1347\

If to Holdings:

> Coffee Holdings LLC
> c/o Falconhead Capital, LLC
> 450 Park Avenue, 3rd Floor
> New York, NY 10022
> Fax: (212) 634-3305
> Attn: Dave Gubbay and Zuher Ladak

with a copy to:

> Charles I. Weissman
> Brian E. Greer
> Davin J. Hall
> Dechert LLP
> 1095 Avenue of the Americas
> New York, NY 10036

Notwithstanding anything to the contrary provided herein, all notices concerning this Plan will be served upon the entities prescribed and in the manner prescribed under the Bankruptcy Code and the Bankruptcy Rules.

### H. Severability of Plan Provisions.

If prior to confirmation, any term or provision of the Plan which does not govern the treatment of Claims or Interests or the conditions to confirmation or the Effective Date is held by the Court to be invalid, void or unenforceable, the Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holdings, alteration or interpretation. The Confirmation Order will constitute a final judicial determination and will provide that each term and provision of the Plan as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. In the event of any conflict between the Plan and the Confirmation Order, the Confirmation Order will govern.

### I. Exhibits.

Exhibits to the Plan or Disclosure Statement that are not filed simultaneously with the Plan and Disclosure Statement will be filed with the Court not less than fourteen days prior to the first date set for the hearing on confirmation of the Plan pursuant to the Bankruptcy Rule 3020 and will be mailed to the Creditors' Committee and any party in interest that makes a written request for such Exhibits to the Debtor.

### J. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan will be deemed as an admission by the Debtor with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification.

## ARTICLE XV.

## CONFIRMATION

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtor has complied with the applicable provisions of the Bankruptcy Code;

- the Debtor has proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by Section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date;

- the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the applicable Debtor has obligated itself to provide such benefits;

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors, and voting trustees of the successors to the Debtor have been made; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan.

### A.    Acceptance

A plan is accepted by an impaired class of claims if holders of at least two thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

### B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor, unless such reorganization or liquidation is contemplated by the plan. Since the Plan provides for the re-revesting of the assets in the Reorganized Debtor, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtor will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date

obligations to pay for the costs of administering and fully consummating the Plan and closing the Reorganization Case. The Debtor will include projections for a twelve month period following the presumed effective date of May 1, 2011 as part of the Plan Supplement. The Debtor believes that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

C.       **Best Interests Test; Liquidation Analysis**

Notwithstanding acceptance of a plan by each impaired class (or satisfaction of the "cramdown" provisions of the Bankruptcy Code in lieu thereof), for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of such class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtor proposing the plan were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what holders of Claims or Interests in each impaired Class would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Reorganization Case were converted to a chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtor would consist of the net proceeds from such disposition of the Debtor's assets, plus any Cash held by the Debtor not otherwise the collateral of the DIP Lender.

As an initial matter, the Debtor believes that, if the Reorganization Case were converted to a chapter 7 case, the DIP Factor and DIP Lender would likely obtain relief from the automatic stay to foreclose on substantially all of the Debtor's assets and that, in a foreclosure sale, the value realized would almost certainly be less than the value realized by Claimholders under the Plan. Nonetheless, even assuming that the Debtor's assets were liquidated by a chapter 7 trustee and that the Liquidation Value of the Debtor's assets would be sufficiently less than the value being distributed under the Plan, as reflected on the liquidation analysis attached hereto as Exhibit F.

In addition, the Claims against the Debtor's estates would be increased by the costs and fees associated with chapter 7 case, including the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's chapter 7 cases. The Debtor's costs of liquidation in chapter 7 cases would include the compensation of a chapter 7 trustee, as well as of counsel and of other professionals retained by the trustee, asset disposition expenses, applicable Taxes, litigation costs, Claims arising during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtor during the Reorganization Case that are allowed in the chapter 7 cases.

Accordingly, the projected recoveries for each Class of Claims and Interests under the Plan are superior to the recoveries that could be realized in a chapter 7 case. Because liquidation of the Debtor would not yield more for the holders of Claims or Interests, the Plan meets the

requirements of Section 1129(a)(7) of the Bankruptcy Code as to any holder of a Claim or Interest in an impaired Class that has not accepted the Plan.

The Debtor believes that this liquidation analysis reflects all relevant information known as of the date of this Disclosure Statement. The Debtor is not aware of any events subsequent to such date that would materially affect this liquidation analysis. This liquidation analysis is provided solely to disclose to holders the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth herein.

### D. Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtor has considered each of these issues in the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy Code.

## ARTICLE XVI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

*1.* Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no guaranty that the Bankruptcy Court would reach the same conclusion.

*2.* Risk of Non-Confirmation of the Plan

Even if the voting classes accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan must be proposed in good faith and is not likely to be followed by the liquidation or the need for further financial reorganization unless such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor were liquidated under chapter 7

of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan under the Bankruptcy Code.

There can be no guaranty, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the Plan have been satisfied. In addition, in the event that the amount of Allowed Claims differ significantly from the amount of such claims that the Debtor currently estimates, the Effective Date may be delayed. Confirmation of the Plan may not occur in the event Holdings exercises its right (pursuant to the DIP Facility and the Plan Support Agreement term sheet) to have the Plan withdrawn, in which case the Debtor would pursue a sale of its assets under section 363 of the Bankruptcy Code.

3.      Risk of Not Meeting Projections

Payments under the Promissory Notes are premised on the Reorganized Debtor meeting its projections over the next 12 months. If the Reorganized Debtor fails to meet its projections, there is a likelihood that payments under the Promissory Notes can be delayed.

## ARTICLE XVII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

THE TAX CONSEQUENCES UNDER THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW AND THE TIME THAT MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND FINAL DISTRIBUTIONS UNDER THE PLAN. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THE DEBTORS, HOLDINGS, AND THEIR RESPECTIVE ADVISORS CANNOT PROVIDE ANY SUCH ADVICE. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE U.S. INTERNAL REVENUE SERVICE, ANY STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE CODE. STATEMENTS REGARDING TAX

IMPLICATIONS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) ARE NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    Allocation of Consideration to Interest

A portion of the consideration received by a holder in satisfaction of an Allowed Claim pursuant to the Plan may be allocated to the portion of such Allowed Claim (if any) that represents accrued but unpaid interest. Unless otherwise proscribed under applicable statute or rule, Distributions under the Plan are allocated first to the principal of a Claim, then to any accrued interest. If any portion of the Distribution were required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the Holder has previously reported such interest as income.

In that event, only the balance of the Distribution would be considered received by the Holder in respect of the principal amount of the Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Holder with respect to the Allowed Claim. If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the Distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

TAX CONSEQUENCES MAY VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## ARTICLE XVIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated alternatives to the Plan, including liquidation or sale under section 363 of the Bankruptcy Code. While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtor or (subject to the Debtor's exclusive periods under the Bankruptcy Code to File and solicit acceptances of a plan or plans of liquidation) any other party in interest in the Reorganization Case could attempt to formulate and propose a different plan or plans of reorganization. Further, if no plan of reorganization under chapter 11 of the Bankruptcy Code can be confirmed, the Reorganization Case may be converted to chapter 7 cases. In that event, the DIP Factor and DIP Lender would likely obtain relief from the automatic stay to foreclose on the Debtor's assets. Furthermore, in liquidation cases under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets, if any, of the

Debtor and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtor of the conversion of the Reorganization Case to chapter 7 liquidation, see Article XV.C of the Disclosure Statement. The Debtor believes that Confirmation and consummation of the Plan is preferable to the available alternatives.

## ARTICLE XIX.

### CONCLUSIONS AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to the alternative described above because the Plan will provide each creditor with a greater recovery than it would receive if the Debtor were to liquidate and distribute their assets under chapter 7, in which case there would likely be a delay in making distributions to creditors, and creditors would likely receive smaller, or in many instances, no distributions. Thus, the Debtor recommends confirmation and implementation of the Plan as the best possible outcome for creditors.

Dated: February 9, 2011

Respectfully submitted,


JAVO BEVERAGE COMPANY, INC.



By:  /s/ Richard A. Gartrell
     Name:  Richard A. Gartrell
     Title:  Chief Financial Officer